# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 2, 2010 Session

## VINCENT SIMS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-25898   Chris Craft, Judge**

———————————

**No. W2008-02823-CCA-R3-PD  - Filed January 28, 2011**

———————————

The capital petitioner, Vincent Sims, appeals as of right from the October 1, 2008 order of the Shelby County Criminal Court denying his initial and amended petitions for post-conviction relief.  On appeal, the petitioner claims that the trial court erred in denying relief because: (1) trial counsel was ineffective; (2) appellate counsel was ineffective; and (3) the imposition of the death penalty in this case was unconstitutional.[1]   After a careful and laborious review of the record, we conclude that there is no error requiring reversal. Accordingly, we affirm the judgment of the post-conviction court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, and ALAN E. GLENN, JJ., joined.

Paul Morrow, Jr., and Daniel E. Kirsch, Nashville, Tennessee, for the appellant, Vincent Sims.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Frank Borger-Gilligan, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

---

[1] We have re-ordered and condensed the separately stated issues on appeal, as set forth in petitioner's initial brief, to those set forth above.

## Background

In 1998, a jury found the petitioner guilty of especially aggravated burglary and first degree premeditated murder in connection with the shooting death of Forrest Smith. The petitioner's trial began on April 27, 1998, and ended on May 1, 1998. The proof presented at the guilt phase of the petitioner's trial, as set forth in our supreme court's opinion affirming the petitioner's convictions and sentences, established the following facts:

On April 5, 1996, Forrest Smith arrived home from work around 10:00 p.m. He found the [petitioner], Vincent Sims, and [the petitioner]'s cousin, Brian Mitchell, in the process of burglarizing his home. Mitchell testified that [the petitioner] had called him earlier in the evening asking for help in moving a big screen television from a house [the petitioner] had burglarized. [The petitioner] picked up Mitchell in a borrowed Toyota Camry belonging to [the petitioner]'s girlfriend. They drove to Smith's house, parked the car under the carport, and loaded the big screen television in the trunk. [The petitioner] and Mitchell were in the house disconnecting a computer when Smith arrived. Smith parked his Jeep in the driveway to block the other vehicle's exit. When Smith entered the house, [the petitioner] and Mitchell ran outside but were unable to get the Camry out of the driveway. [The petitioner] went back into the house while Mitchell remained outside.

Mitchell testified that he heard [the petitioner] yelling at Smith to give [the petitioner] the keys to the Jeep. Mitchell then heard eight or nine gunshots fired inside the house. [The petitioner] returned carrying Smith's .380 caliber chrome pistol and the keys to the Jeep. [The petitioner] was holding his side and told Mitchell that he had been shot. [The petitioner] threw Mitchell the keys to move the Jeep, and the two fled the scene in the Camry. Mitchell testified that [the petitioner] told him that [the petitioner] and Smith had fought over the .380 caliber pistol and that [the petitioner] had shot Smith. [The petitioner] told Mitchell that [the petitioner] had to kill Smith because Smith had seen [the petitioner]'s face. [The petitioner] instructed Mitchell not to talk to anyone about what had happened and later threatened Mitchell's life after they were in custody.

Smith's girlfriend, Patricia Henson, arrived at the home shortly after the shooting, sometime between 10:00 and 10:30 p.m. Smith was lying on the kitchen floor in a pool of blood, but he was conscious and asked Henson to call 911. When asked what had happened, Smith was able to tell Henson and Officer Donald Crowe that there had been a robbery and that Smith had been

2

shot in the head. Officer Crowe testified that Smith was bleeding from several parts of his body, appeared to have been shot more than once, and was in severe pain. After receiving treatment by paramedics on the scene, Smith was transported to the hospital. He died approximately four and a half hours later.

In the meantime, [the petitioner] took Mitchell home and picked up [the petitioner]'s girlfriend, Tiffany Maxwell, from work after she clocked out at 11:05 p.m. Maxwell testified that [the petitioner] was visibly upset and had blood on his shirt. Upon inquiry, [the petitioner] told her that someone had attempted to rob him. Maxwell also noticed that he had a "deep scar" injury on his side, which she treated herself after [the petitioner] refused to go to the hospital. The following morning, [the petitioner] and Maxwell took Maxwell's car to be washed and detailed. Maxwell then noticed that the license plate frame on her car was broken. [The petitioner] and Maxwell attended an Easter Sunday church service the next morning. According to Maxwell, [the petitioner] behaved normally with nothing unusual occurring until the following Tuesday when [the petitioner] was arrested at Maxwell's place of employment.

After [the petitioner] and Mitchell were in custody, [the petitioner] gave Mitchell a letter to deliver to Mitchell's attorney. In that letter, [the petitioner] recalled the events surrounding the burglary and murder. [The petitioner] alleged that Smith had fired at [the petitioner] and Mitchell as they fled the house. Mitchell testified that this portion of the letter was untrue. Mitchell maintained that no shots were fired until [the petitioner] went back inside the house to get Smith's keys to the Jeep. [The petitioner] also contended in the letter that Smith was accidentally shot in the head while the two struggled over the .380 caliber pistol.

Significantly, however, the bullet removed from Smith's brain was a .22 caliber bullet. The police also recovered fragments from three or four .22 caliber bullets at the scene. Mitchell testified that he had seen [the petitioner] with a long barrel .22 caliber revolver with a brown handle earlier in the evening. Although Mitchell did not see [the petitioner] with the revolver during the burglary, he did see something protruding under [the petitioner]'s shirt. In addition to the .22 caliber bullets, the police found a bullet fragment from a probable .380 caliber bullet and five fired .380 caliber cartridge cases at the scene. Officers also recovered from Smith's carport a beeper that was later identified as belonging to [the petitioner] and the broken license plate frame from Maxwell's car.

3

Forensic pathologist Wendy Gunther performed the autopsy on Smith. She testified that Smith suffered a gunshot entry and exit wound to his head. Part of the bullet entered Smith's brain and lodged in his skull above his right eye, and the other piece exited in front of his right ear. Smith also suffered multiple blows to his head, neck, shoulders, arms, sides, back, and buttocks. The bruising indicated that Smith had been struck with a long, narrow, rod-shaped object at least a quarter inch wide. Dr. Gunther estimated that Smith had been struck at least ten times but probably many more. She stated that the blows were very hard as evidenced by the immediate bruising on Smith's body. Smith suffered at least six blows to his head, one of which fractured his skull at the back of his head. Dr. Steven Symes, a forensic anthropologist, opined that this head injury was inflicted after the gunshot wound to Smith's head. Although the gunshot wound to the head was the worst injury and would by itself have caused death, Dr. Gunther testified that the cause of death was a combination of all of the injuries.

*State v. Sims*, 45 S.W.3d 1, 5-7 (Tenn. 2001).

Based on these facts, the jury convicted the petitioner of especially aggravated burglary and first degree premeditated murder. The proof presented at the penalty phase of the petitioner's trial, as set forth in the supreme court's opinion, established the following facts:

The State presented evidence through Jennifer Gadd, an employee with the Criminal Court Clerk's Office, that [the petitioner] had two prior convictions for aggravated assault. The State also submitted all evidence from the guilt phase in support of its position in the penalty phase.

The defense presented five mitigation witnesses, [the petitioner]'s mother, father, brother, and two aunts. These family members testified that [the petitioner] was a good child who never got into trouble until sometime in his teens. They also testified that [the petitioner] had close relationships with his family. One of his aunts, Mary Gardner, worked at the Shelby County Correctional Facility and testified that [the petitioner] was a model prisoner while incarcerated there. On cross-examination the State was allowed to question the mitigation witnesses regarding [the petitioner]'s prior convictions for theft in 1990, aggravated assault in 1991, and aggravated burglary in 1993.

*Id*. at 7.

4

At the conclusion of the penalty phase, the jury found that four aggravating circumstances were present, that these aggravated circumstances outweighed any mitigating circumstances, and that the trial court should sentence the petitioner to death for the murder. The aggravating circumstances found by the jury were: (1) the petitioner was previously convicted of one or more felonies whose statutory elements involve the use of violence against the person; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the petitioner or another; and (4) the murder was committed during the commission of a burglary or theft. *See* Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7) (1997). The trial court sentenced the petitioner to twenty years imprisonment for the especially aggravated burglary, and the jury sentenced him to death by electrocution for the first degree murder. The court ordered that the especially aggravated burglary sentence run consecutively to the death sentence. This court affirmed the petitioner's convictions and sentences on direct review, and the Tennessee Supreme Court affirmed this court's opinion. *See State v. Vincent C. Sims*, No. W1998-00634-CCA-R3-DD, 2000 WL 298901, at *1 (Tenn. Crim. App. at Jackson, Mar. 14, 2000), *aff'd*, 45 S.W.3d 1 (Tenn. 2001), *cert. denied*, 534 U.S. 956 (2001).

### Post-Conviction Proceedings

On November 15, 2001, the petitioner filed a *pro se* petition for post-conviction relief challenging his convictions and sentences and raising several grounds for relief. Upon consideration of the petition, the trial judge appointed the Office of the Post-Conviction Defender as counsel of record for the petitioner and directed appointed counsel to file an amended petition. Post-conviction counsel filed the amended petition on August 8, 2002, and the state filed its response on September 3, 2002. The post-conviction court held an evidentiary hearing on the claims raised in the initial and amended petitions on March 17-20, 2003, September 17, 2004, and November 5, 2004. On October 1, 2008, the trial court entered an order denying all claims raised in the initial and amended petitions.

### Evidence Presented at the Hearing

Trial counsel testified that he received his law degree in 1975 from Memphis State University, now known as the University of Memphis. His undergraduate degree is in psychology. He had previously worked for the criminal court clerk's office in Memphis. He became a private practitioner upon becoming licensed. From 1975 until 1995, about one-quarter of his cases were criminal. During that time, he handled several major felony cases, including two death penalty cases which resulted in life sentences. He testified that he had probably handled less than ten capital and noncapital first degree murder cases in the years

leading up to 1995. He had also attended training in capital litigation both at a conference given by the Tennessee Association of Criminal Defense Lawyers (TACDL) in Nashville and at a local seminar.

Trial counsel testified that he had been working part-time for the capital defense team at the Shelby County Public Defender's Office since May of 1995. He continued to maintain his private practice while working for the public defender's office. His overall criminal caseload while working as a member of the capital defense team remained constantly at 25-30%. On cross-examination, trial counsel stated that the public defender's office hired him to work on the capital defense team in 1996 and that the only part-time work he had done for the public defender's office before that time had been a substitute for another attorney on preliminary hearings in general sessions court in either 1977 or 1978.

During the petitioner's trial, two other full-time attorneys were on the capital defense team. The capital defense team also had three factual investigators and three social investigators; however, trial counsel later testified that only two "mitigation people" were on the team. By the end of his first year on the team, trial counsel had seven cases assigned to him as lead counsel and approximately six cases in which he functioned as second chair. His case load steadily grew over time, and by the time the court appointed him to represent the petitioner, trial counsel approximated that he was lead counsel on ten cases and second chair on eight cases. The other members, by virtue of their full-time status on the team, had larger case loads than trial counsel. Trial counsel estimated that, at any given time, the entire team handled close to forty cases. Not all cases handled by the team were death penalty cases. The team handled any cases in which the death penalty was a possibility. They would remain on cases, even if the prosecution decided not to seek the death penalty, if more than thirty days had elapsed since the date of arraignment in criminal court. Although he was a part-time member of the capital defense team, trial counsel's work as lead counsel on any given case was a full-time endeavor until they concluded the case. Trial counsel testified that his workload during his representation of the petitioner was not such that he could not devote sufficient time to the case. On redirect examination, trial counsel acknowledged that the public defender's office paid him a salary for his part-time work on the capital defense team, and not by the hour. Trial counsel's time records on the case showed that he spent 72 hours of in-court time and 195 hours of out-of-court time working on the case.

Trial counsel became lead counsel for the petitioner in April 1996 after the petitioner had already given a statement to the police on April 9, 1996. Consistent with the manner in which the capital defense team operated at the time, trial counsel's supervisor initially received the case on April 28, 1996, visited with the petitioner at the jail to inform him about who would be handling his case, and subsequently assigned trial counsel as lead counsel. The supervisor also assigned co-counsel, a factual investigator, and a mitigation investigator.

6

Trial counsel and co-counsel conducted their first intake interview with the petitioner on May 8, 1996. Trial counsel's responsibilities after that time were to direct the investigators assigned to the case, represent the petitioner at the preliminary hearing, and continue representation in criminal court. The investigators were free to interview anyone they deemed necessary after the initial intake interview, but trial counsel would also give them specific requests to investigate different avenues as he saw fit. Trial counsel's duties related to the guilt phase of the trial, and the mitigation investigator's responsibility was to develop the case for mitigation in the penalty phase. Trial counsel was responsible for interviewing potential defense witnesses for the guilt phase and obtaining any relevant documents that would help the petitioner's defense. The mitigation investigator's duties were to obtain the social background records on the petitioner and speak with family members and potential witnesses for the penalty phase.

Trial counsel and co-counsel met at least monthly to review the status of the case and to discuss what role they were each going to take at trial, what avenues they needed to pursue, and the areas in which they were having problems. The entire capital defense team held these meetings monthly, and they discussed their various cases and sought insight from each other. These meetings usually lasted two hours. Trial counsel testified that it was possible that co-counsel had only met and talked with the petitioner at the initial intake interview and approximately one week before trial. However, co-counsel participated in the entire trial and conferred with trial counsel on issues during trial. Trial counsel handled everything at trial, including jury selection, except the cross-examinations of three witnesses and opening and closing arguments at sentencing, which co-counsel handled.

Trial counsel testified that he was familiar with the *American Bar Association (ABA) Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* and that he had reviewed the guidelines before the petitioner's trial. He further stated that neither he nor any other member of the defense team sought help from any well-known death penalty defense organizations such as the National Association for the Advancement of Colored People (NAACP) Legal Defense Fund or the Southern Center for Human Rights. Trial counsel explained that, given the monthly meetings he had with the entire capital defense team, he did not see the need to seek outside assistance. He stated that his supervisor had started the capital defense team and had a great deal of experience in capital litigation. He, therefore, felt that the team had all the experience that he needed to assist him in his representation of the petitioner. Trial counsel testified that he was also aware of the 1992 TACDL manual for the handling of Tennessee death penalty cases, had a copy of the manual himself, was aware that the Shelby County Public Defender's Office had a copy of the manual, and had consulted the manual during the preparation of the petitioner's case.

Trial counsel testified that he was aware of the case law, statute, and supreme court

rule that allow defense counsel in capital cases to seek funding for the employment of experts. He also testified that he consulted with several experts while preparing the petitioner's case, although he did not call any of them to testify during the trial.

Trial counsel testified that the pretrial motions he filed in the petitioner's case were part of a standard packet always filed in cases handled by the capital defense team. Trial counsel testified that one standard motion he filed in the petitioner's case was a motion requesting the state to announce whether it was going to seek the death penalty. Trial counsel testified that the purpose of that motion was to determine whether the capital defense team would stay on the case. Trial counsel acknowledged that the response to the motion was the formal notice of the state's intent to seek the death penalty against the petitioner.

At the first intake meeting with the petitioner, trial counsel obtained information from the petitioner about his background and the facts surrounding the case. During this initial intake interview, the mitigation investigator completed a mitigation evaluation form. The petitioner's post-conviction counsel introduced a copy of the completed form into evidence at the hearing. According to the information obtained from the petitioner and reflected on this form: (1) the petitioner's family members had no history of alcoholism, epilepsy, mental illness, institutionalization, or incidents of physical or sexual abuse; (2) the petitioner had completed the tenth grade, could read and write, had no learning disabilities, and had left school due to an arrest for drug possession; (3) the petitioner had tried out for basketball while in school, but the coach cut him from the team; (4) the petitioner had been in the band from the seventh through ninth grades and had obtained awards for being in the band because he "was good"; (5) the petitioner's history of major accidents or illnesses included a laceration to the head during a fight as a child, a broken finger in 1989, a gunshot wound to the right arm and right side in 1989, and a gunshot wound to the right side sustained during the incident that is the subject of these charges; (6) the petitioner's history of substance abuse included drinking beer daily, drinking Crown Royal on the weekends, and snorting cocaine occasionally starting at age thirteen or fourteen; (7) the petitioner had no history of mental illness and no history of venereal disease; (8) the petitioner had undergone no prior psychological or neurological evaluations; (9) the petitioner had a history of dizziness, fainting spells and dropping objects due to sinus problems; and (10) the petitioner denied any history of suicide attempts, but hesitated when answering.

As part of her investigation, the mitigation investigator also interviewed the petitioner's parents and prepared a written report of her interview for counsel. The petitioner's post-conviction counsel entered the mitigation investigator's March 25, 1997, written report from this interview into evidence at the hearing. The report stated, in pertinent part, as follows:

8

The [petitioner] is the youngest of two (2) children. He is also first cousin to his co-defendant. [The petitioner] is married . . . and [he and his wife] have a three (3) year[-]old daughter . . . . He also has a two (2) year[-]old son . . . conceived from a previous [brief] affair. . . . As a result of this affair and his arrest[,] [the petitioner's wife] has separated from [the petitioner,] but she continue[s] to maintain contact with the [petitioner]. [In fact, the petitioner's parents keep the petitioner's daughter] during the week and [her maternal grandmother] keeps her on the [weekends]. . . .

According to [the petitioner's mother], her son was a normal birth. The [petitioner]'s growth was within normal limits as well. Both [of the petitioner's parents] spoke very fondly of their son. [The petitioner's mother] states her son was a very quiet and mild mannered child. He was an honor student until the eighth (8) or [ninth] (9) grade. It was after this period that her son [began] to experience some behavior problems and running with the wrong crowd. According to [the petitioner's father], their son did not complete high school because he got arrested on the charge of aggravated assault. Per [the petitioner's father], his son never considered returning back to school nor getting his GED because of the arrest. Unlike his brother . . . , who was very active in school, [the petitioner's mother] states the [petitioner] was never active in school. He showed no interest in participating in anything in school [including] sports. Per [the petitioner's father] the relationship between his sons was very good. According to [the petitioner's mother] they were . . . very close. Both parents could not understand why their son could have committed such a crime. According to [the petitioner's father], they tried to be the best parent[s] to their sons. Per [the petitioner's father] this crime was uncall[ed] for[;] however, he and his wife will support [the petitioner] and his defense team.

[The petitioner's mother] state[s] after her son served his jail time, he was able to get a job at Nike. He move[d] home briefly with them and moved out shortly after his marriage . . . . Per [the petitioner's father], he and his wife assisted them in getting their [apartment] and getting it furnished.

Both parents deny any history of mental illnesses in either of their families. The [petitioner] was hospitalized for a gunshot wound he [received] in 1989. To their knowledge[,] this was the only time their son was [hospitalized]. [The petitioner's father] recalls that shortly after the shooting their son obtain[ed] a gun for "his protection" and since that time their son continued to get involved in various bouts with the law.

9

Both [parents admit] that their son was abusive to his wife, which [led] to her having to call the police and [the petitioner] subsequently getting arrested and convicted of [assault] and [b]attery. [According] to [the petitioner's mother], her son has a quick temper[,] and he never sought help for this problem himself . . . until his arrest [when] the judge ordered him to attend [an] [a]nger [m]anagement group.

[The petitioner's father] states that [despite] how it appears, their son is a good person who is very protective of his family. According to [the petitioner's mother] her son will give you the clothes [off] his back if you needed it.

According to trial counsel, the petitioner's family was very cooperative in preparing a mitigation case, except for the petitioner's brother, who refused to testify at both the guilt and penalty phases of the trial. Besides the petitioner's parents and brother, the only other family member of whom trial counsel was aware of was the petitioner's aunt. Trial counsel also admitted that the only time he spoke with the petitioner's brother or aunt was at trial before their testimony. He could not recall contacting the petitioner's brother or aunt before trial. Upon being asked, trial counsel found it to be improbable that no one on the defense team contacted these individuals until after the jury had convicted the petitioner at the guilt phase. Trial counsel found it most likely that the mitigation investigator had been in contact with these individuals. Trial counsel testified that the petitioner never gave him the names of any potential witnesses other than those who testified at trial. He stated that the petitioner's family attended the trial.

According to trial counsel, typically about 60-65% of the background information on a defendant in a capital case comes from the defendant himself. He testified that, based upon the information provided by the defendant, the defense team contacts other people, including family members, to provide additional information. Trial counsel testified that the petitioner's family did not contradict anything that the petitioner told the defense team about his background.

Trial counsel testified that he was aware that the petitioner and his brother had different last names; however, he was not aware that they had different fathers. Trial counsel admitted that no investigation into the background of the petitioner's father was done beyond the social history given to the defense team by the petitioner and his parents. Trial counsel also testified that the defense team knew that the petitioner's mother suffered from diabetes and had undergone some prior treatment for depression. However, trial counsel admitted that no investigation was done to corroborate the mother's assertion that the petitioner's birth had

10

been normal or her assertion that the petitioner's growth as a child had been within normal limits.

Trial counsel also admitted that the petitioner's school records did not appear to corroborate the assertion by the petitioner's parents that the petitioner had been an honor student until the eighth or ninth grade. However, trial counsel clarified on cross-examination that these records did show the petitioner having achieved A's, B's, and C's through the sixth grade and only declining in school performance when he reached the seventh grade. Trial counsel acknowledged that the school records seemed to contradict the petitioner's parents' assertion that the petitioner was not very active in school. The records showed that the petitioner had participated in the band as he had reported to the defense team during the initial intake interview.

Trial counsel's understanding of the circumstances surrounding the petitioner's self-reported 1989 gunshot wound had been that the petitioner stepped between his brother and the shooter during an altercation to save his brother from being shot. Trial counsel admitted that he had never seen any police reports on the incident and that the files for the petitioner's case contained none. Post-conviction counsel introduced a certified copy of the police records from this incident, which occurred on July 4, 1990, into evidence at the hearing. Before trial, the defense team had obtained the petitioner's hospital records from the shooting incident, which post-conviction counsel also entered into evidence during the hearing. The medical records revealed that the petitioner had sustained a close-range, small caliber, gunshot wound to the right shoulder during the incident. The bullet lodged in the petitioner's muscle without causing any vascular damage or damage to any other systems. Doctors discharged the petitioner from the hospital five days after the incident without the need for any medication.

The defense team had also obtained emergency room medical records documenting a mild concussion the petitioner sustained during an altercation on May 10, 1992, while he was an inmate at the Shelby County Jail. Trial counsel conceded that, contrary to the petitioner's self-report at the initial intake, these records revealed that the petitioner had undergone a neurological examination as part of his treatment for the concussion. However, trial counsel testified that he was unaware of the petitioner having undergone any other psychological or neurological testing. Trial counsel admitted that the defense team did no additional investigation into the petitioner's self-reported history of dizziness, fainting, and dropping objects. Trial counsel also conceded that neither he nor the mitigation investigator obtained any records from the court-ordered anger management group that the petitioner's parents said the petitioner had attended.

Trial counsel testified that the petitioner's family never suggested to the defense team

11

that the petitioner had any emotional, psychological, or mental problems. In fact, trial counsel testified that the petitioner's parents emphatically asserted that the petitioner was "not crazy." Trial counsel testified that neither the petitioner nor anyone else had ever suggested that the petitioner suffered from a mental illness or mental disease or defect. Trial counsel testified that, in his experience as a lawyer on capital cases and in general practice, he encountered individuals on a fairly frequent basis who had some mental problem that required follow-up investigation. Trial counsel testified that he had also specifically dealt with individuals who he had suspected were suffering from some kind of mental disease or defect. He testified that, in such circumstances, he had arranged for testing that resulted in some cases with findings of a defect and in other cases with findings of malingering. Trial counsel acknowledged that, in the petitioner's case, the defense team did not obtain the assistance of any psychological experts. He stated that if anyone had suggested the need for further evaluation of the petitioner, he would have followed up and done more investigation.

During the representation, trial counsel met with the petitioner several times. To him, the petitioner seemed to understand the substance of their conversations about the case and seemed to have no problem comprehending what counsel said to him. Trial counsel admitted that he did not know the petitioner's specific IQ.

According to trial counsel, the petitioner informed him during their preparation for trial that he had been drinking on the day of the offenses and that he had also used marijuana. Trial counsel testified that the defense team considered possibly obtaining an expert to speak about alcohol and drug use, but they decided that such testimony had no basis. Trial counsel testified that, in his opinion, neither alcohol nor drugs played a significant role in the petitioner's actions on the night of the offenses. As such, trial counsel determined that the petitioner's self-reported alcohol and drug use would neither support a valid defense of intoxication nor be viable mitigation at the penalty phase. However, trial counsel admitted that in his written notes from a meeting with the petitioner five days before the trial, he had written: "Thinks Brian [Mitchell] will admit to influence of cocaine in car on way over — snorted & Crown Royal." Trial counsel explained, on cross-examination, that he did not feel this information was significant because in neither Mitchell's nor the petitioner's statements to the police had they made any statements about the use of cocaine that night. Trial counsel testified that in their statements, both men admitted to only limited use of intoxicants on the night of the offenses. Trial counsel testified that he would have further investigated had he felt that drug addiction or drug abuse had been a factor in this case. Trial counsel stated that the petitioner's recollection of events at the scene of the offenses had been "pretty good." To trial counsel, nothing suggested that the petitioner had blackouts at the time of the offenses or was confused about the facts or circumstances surrounding the offenses because of intoxication. Trial counsel noted that the only inconsistency between the petitioner's initial statement to the police on April 5 and his later statement on April 9 after his arrest

concerned who was responsible for the shooting. The petitioner initially implicated his cousin and co-defendant, Mitchell, as the shooter.

Trial counsel testified that he gave the petitioner, for his review, a copy of "every piece of paper" of discovery he received from the state. Trial counsel first testified that he received co-defendant Mitchell's statement, which was the only proof supporting the conviction for avoiding arrest and prosecution, an aggravating circumstance, in pretrial discovery. However, trial counsel later testified that the first time he received the statement may have been after Mitchell testified at trial. Trial counsel also admitted that a pretrial comparison of the latent fingerprints found at the scene to samples from the petitioner and Mitchell was negative. The court admitted into evidence a copy of the written report from the Memphis Police Department that contained the fingerprint test results.

Trial counsel personally met with the medical examiner, Wendy Gunther, and obtained the autopsy report on the victim. Trial counsel testified that, when he gave him a copy of the autopsy report, the petitioner noticed some discrepancies in the report concerning the age and residence of the victim and pointed those out to counsel. According to trial counsel, the petitioner believed these discrepancies to be significant. Specifically, the petitioner was adamant that the body in the photographs accompanying the autopsy report was not the victim because it had "too many blows on it."

Trial counsel acknowledged that application of the heinous, atrocious, and cruel aggravating circumstance had been based on the nature and sequence of the wounds to the victim's body. Trial counsel admitted that the defense team never tried to get any of the victim's medical records other than the autopsy report. Trial counsel stated that the only things he knew about the victim were where he worked, that he lived with his girlfriend, Patricia Hensen, and that Hensen had been out to dinner with friends on the night of the homicide. Trial counsel testified that he never spoke to Hensen. However, trial counsel testified that he consulted with a pathologist, Dr. Cleland Blake, with respect to the sequence of the victim's injuries. Trial counsel stated that Dr. Blake had agreed with the conclusions reached by Dr. Symes, the forensic anthropologist who testified at trial as to the sequence of the injuries. Trial counsel stated that Dr. Blake had only reviewed Dr. Symes's report, and Dr. Blake did not review any tissue samples or photographs of the body of the victim. Trial counsel did not obtain these items for this expert to review and stated that Dr. Blake never asked to review the physical evidence in order to render an opinion. Trial counsel said that he would have filed a motion to release the physical evidence if Dr. Blake had asked to review the evidence.

Trial counsel testified that he filed a pretrial motion seeking disclosure of any promises or consideration given to any state witnesses in exchange for their testimony. The state

13

responded to this motion by stating that it would promptly disclose to the defense any promises or consideration given by the state in exchange for testimony. Trial counsel never received notice from the state regarding any such promises or consideration given to a state witness. Trial counsel stated that the defense team had been primarily seeking information regarding any deals the state might strike with Mitchell in exchange for his testimony against the petitioner. Mitchell testified at trial that there had been no deals made to him in exchange for his testimony. According to trial counsel, until the weekend before trial, the petitioner felt that Mitchell would not testify as a state witness. In fact, until the time that Mitchell walked into the courtroom to testify, the petitioner was sure that Mitchell would not testify against him. Trial counsel testified that he knew that the petitioner and Mitchell were "freely conversing" with each other in the jail before trial. Trial counsel recalled speaking to Mitchell's attorney and asking him if the state had made any offers to Mitchell in exchange for his testimony. Trial counsel could not recall if he ever asked Mitchell's attorney for permission to talk to Mitchell directly.

Trial counsel recalled only knowing that Mitchell and the petitioner were cousins. Trial counsel did not recall knowing about Mitchell's claims that he was slow or unable to read and write. When post-conviction counsel presented him with a copy of a juvenile court order that allowed the court to try Mitchell as an adult for the offenses committed with the petitioner, trial counsel acknowledged that the document showed that Mitchell had ten prior contacts with the juvenile court before the offenses committed with the petitioner. Trial counsel admitted that the defense team did not obtain any further juvenile records on Mitchell as part of the preparation for the petitioner's case. Post-conviction counsel introduced a copy of Mitchell's juvenile court records into evidence. Trial counsel conceded that he did not think to use Mitchell's juvenile record to impeach him during cross-examination at the petitioner's trial. Trial counsel was unable to recall any reason not to have cross-examined Mitchell about his use of drugs and/or alcohol on the night of the crimes.

Trial counsel testified that the petitioner initially denied writing the handwritten letter that Mitchell gave to his lawyer. He further testified that it was only after the state engaged handwriting experts to analyze the petitioner's authorship of the letter that the petitioner admitted that he wrote it. Specifically, trial counsel recalled talking to two handwriting experts, one of whom was Marty Guinn-Pearce, on the issue of whether the petitioner had written the letter given to Mitchell. Trial counsel testified that the handwriting analysis conducted by Ms. Guinn-Pearce was not helpful to the petitioner's case. Trial counsel testified that the petitioner finally changed his position about his authorship of the letter and signed a written statement acknowledging that he was the author of the letter on December 3, 1997, which was very close to trial. Post-conviction counsel introduced a copy of this document into evidence at the hearing. It reads:

14

After my indictment and arraignment, my cousin, Brian Mitchell, asked me to write a true statement of our participation in the burglary at 1096 S. Perkins on April 5, 1996.

I wrote a two (2) page statement in block print and delivered it to my cousin. He forwarded it to his attorney.

That statement was examined by Thomas Vastrick and found to be my handwriting. He also took exemplars of my handwriting to make the comparison.

I hereby acknowledge that I wrote the statement and waive any further contest of the issue. I understand that my attorney has obtained permission to have it examined by another expert but I feel that such further examination would be fruitless, and I therefore waive same.

Trial counsel testified that the petitioner giving Mitchell the inculpatory letter and then denying having written it did not make sense to him.

The prosecution initially charged the petitioner with felony and premeditated first degree murder under alternative theories. Trial counsel testified that he discussed the concept of felony murder with the petitioner during trial preparation and felt that the petitioner understood the concept. However, trial counsel acknowledged that the petitioner wanted to raise self-defense as a defense at trial. Trial counsel said that he explained to the petitioner that self-defense was not a valid defense to the felony murder charge and sent the petitioner some case law on the subject. Trial counsel then identified two letters he sent to the petitioner during his representation. Post-conviction counsel introduced these letters, dated June 4, 1997, and December 15, 1997, as a collective exhibit during the hearing.

In his letter dated June 4, 1997, trial counsel referenced the petitioner's May 28, 1997 letter, which contained several questions about the case. In response to the petitioner's inquiries, trial counsel informed the petitioner that the cases that he had sent to the petitioner to explain why self-defense was not a valid defense to felony murder were not "totally different" from the petitioner's case as the petitioner had apparently asserted in his previous letter. In the June 4 letter, trial counsel wrote:

You misunderstand the concept of Felony Murder. If it is proven that you were either engaged in a burglary of Mr. Smith's house or attempting to burglarize his house at the time that Mr. Smith died and his death was closely connected to that felony, you can be convicted of Felony Murder. That's all it

15

takes. I have previously given you the charge that the Court will probably give regarding that offense, and I beg you to re-read it and try [to] understand it. The cases all say or explain the basis of Felony Murder that the intent to Murder is inferred from the intent to commit a felony. The state does not have to prove a separate premeditation or deliberation in order to convict [for] Felony Murder.

As I have explained to you before, I anticipate that the inconsistencies which you have included in your recent letter will be explained on the simple basis that mistakes were made. I believe that is an adequate explanation and I believe the jury will accept it.

. . . .

You make some statements regarding evidence and conclude that autopsies are considered lay opinions. They are not. Autopsies are considered expert evidence. I anticipate Dr. Gunter [sic] will testify, or another member of her office, as to the contents of that autopsy. It will be accepted as expert proof as to the cause of death.

. . . .

I hope this answers your questions. You write in a very rambling manner and it is difficult to determine what you are asking at times. I have painstakingly gone over these questions, and believe that I have answered all of them. In any event, I will see you soon and we will discuss this further. . .

Trial counsel acknowledged that understanding what the petitioner was asking in his letters was difficult for him. Trial counsel felt that the petitioner eventually understood that, in counsel's opinion, self-defense was not a defense to felony murder, and counsel did not pursue the theory of self-defense at trial. Trial counsel explained that the petitioner's problems with the concept of felony murder had more to do with his refusal to grasp and believe what trial counsel was saying to him than with any inability to understand or comprehend the subject. Trial counsel testified that he had worked on other cases where he had explained the law to a defendant, and he or she just did not like it or believe it. Trial counsel explained that many defendants do not trust him when he tries to explain the law to them as applied to their particular facts. Trial counsel testified that the petitioner had a hard time accepting the felony murder doctrine. He said that the petitioner wanted to testify that the victim "confronted him and there was a confrontation with weapons and the homeowner wound up getting killed but this was all because [the petitioner] was trying to defend himself." Trial counsel stated that he explained to the petitioner that, under the law, "that just [would

16

not] fly."

Trial counsel contacted a firearms expert, Bob Goodwin, a retiree from the Tennessee Bureau of Investigation, to review the conclusions reached by Donald Carmen, the state's firearms expert, regarding what caliber bullet caused the victim's death. Trial counsel testified that the defense even got a continuance of the trial to consult with a firearms expert due to the late disclosure by the state of the conclusions reached by Carmen. Trial counsel admitted that Goodwin reviewed only the report generated by Carmen and did not review the physical evidence itself. Trial counsel did not offer to obtain this evidence for Mr. Goodwin's review. Goodwin never asked trial counsel to allow him to review the physical evidence to render an opinion. If he had, trial counsel said that he would have filed a motion to release the physical evidence for that purpose.

Trial counsel testified that before trial, the state had offered to allow the petitioner to plead guilty to the offenses in exchange for concurrent sentences of life without parole for the murder and ten years imprisonment for the burglary. Trial counsel presented this offer to the petitioner, but the petitioner turned it down after several lengthy conversations with counsel about the proof that the state would introduce in the case and the pros and cons of pleading guilty. Trial counsel testified that the petitioner's position had been that, if he were going to get any kind of sentence in the case, the state would have to impose it upon him; he would not agree to it. Trial counsel testified that the petitioner signed a written rejection of the plea offer on December 3, 1997, for counsel's files, which post-conviction counsel introduced into evidence at the hearing. The last paragraph of this document stated:

> I know that I am charged with Felony Murder and at least one Aggravating Factor cannot be disputed — I have two (2) prior convictions for crimes whose elements involve violence to a person. I believe that my defense is self-defense even though my attorney has advised me that such is not properly a defense to a felony murder case.

When asked on cross-examination why he had the petitioner sign the written rejection of the plea offer, trial counsel responded: "Because I thought he was making a very foolish decision." Trial counsel felt that the petitioner should have taken the plea deal. He stated that he felt at the time that there was a strong likelihood that the petitioner would get the death penalty. Trial counsel admitted that their numerous conversations about the plea offer "may have been the cause of some friction between the two of [them]."

Trial counsel testified that he thought he and the petitioner had a good relationship until they began talking about the plea deal. However, trial counsel admitted that the petitioner had filed a bar complaint against him during the representation to obtain disclosure

17

of some documents. Trial counsel testified that such complaints were common in indigent defense work. Trial counsel stated that the filing of the complaint did not have any impact on the way he represented the petitioner. Trial counsel further stated that, even when he was having difficulties with the petitioner, he never stopped working full-time on preparing the case for trial.

Trial counsel could not recall whether any of the jurors on the petitioner's case had ever sat on a criminal case before, much less a death penalty case. Trial counsel acknowledged that, if he knew of a juror who had sat on a death penalty case before, he would not have wanted to keep that juror on the panel. Trial counsel recalled that during voir dire, many prospective jurors in the petitioner's case said they had been the victims of a crime. Trial counsel further testified that during voir dire, he had questioned prospective jurors on their ability to impose the death penalty, that he eliminated some jurors from service because they stated they could not impose the death penalty, and that he had attempted to rehabilitate other jurors whose answers to this line of questioning made them subject to being eliminated from the panel. Trial counsel also specifically recalled having had a conversation with co-counsel about voir dire and who would handle the rehabilitation of any cause challenged jurors. Trial counsel stated that he never sought permission to administer a written jury questionnaire to potential jurors in the petitioner's case. However, he testified that he normally only used a written questionnaire in cases involving a great deal of pretrial publicity, which this case did not have. Trial counsel testified that the only media coverage given to this case had been a "two-inch article in the newspaper" a couple of years before the trial.

Trial counsel testified that the petitioner had adamantly refused to testify on his own behalf at either stage of the trial, though counsel advised him of his right to testify and urged him to testify at the penalty phase. Trial counsel explained that the defense team made it clear to the petitioner that it was his decision whether to testify. Trial counsel also explained that he and the defense team explained to the petitioner who the prosecutors were and what he could expect from them during cross-examination if he testified. Trial counsel testified that he specifically told the petitioner that the prosecutor would be thorough in his cross-examination if the petitioner elected to testify.

Trial counsel testified that his defense position at the guilt phase of the trial had been to establish reasonable doubt in the minds of the jurors and to show that the homicide was not closely connected to the underlying felonies and to undercut the state's case for felony murder. On cross-examination, trial counsel explained his theory as follows:

> Well, we thought it was more felony murder than it was premeditated first degree murder. And based upon that, of course, [the petitioner] wanted to assert self defense at his trial. We tried to separate the underlying felonies, the

18

burglary and the theft, from the homicide. There was a point at which he left the house and came back in. And basically it was just reasonable doubt along those lines.

Trial counsel stated that the petitioner never denied his involvement in the offenses; the only issue for trial was the level of his involvement and possible consequences. Trial counsel conceded that the proof against the petitioner was "pretty significant." Trial counsel further testified that the only defense the petitioner offered to counsel was that of self-defense. Trial counsel testified that he does not take it upon himself to create a defense for a defendant.

Trial counsel testified that his defense position at the sentencing phase of the trial had been to generate some sympathy for the petitioner because he did not have any of "the typical bad things . . . about people to present." Trial counsel emphasized that all of the mitigating circumstances that he charged were non-statutory, except the petitioner's age. Trial counsel agreed that "a fair representation" of the petitioner's background was that the petitioner had been a good child who started having problems when he got to junior high school and got picked on by bullies. On cross-examination, trial counsel explained that in the penalty phase he attempted to

> show them that [the petitioner] was a human being, that he wasn't just somebody who broke into a house and killed a homeowner. I wanted to show that he had a family that cared about him. That he could do well in a structured environment of a penal farm or penitentiary environment. Those sorts of things.

Trial counsel testified that, to that end, his strategy in the penalty phase of a capital case was to generally present everything in mitigation that the jury could possibly see "as some reason for giving [the petitioner] less than death." Trial counsel agreed, however, that if something is presented in mitigation about the circumstances of the crime that a defendant's statement to police did not reflect, the presentation of that mitigation might affect counsel's credibility with the jury as to the weight the jury gives to any argument it accepts or rejects.

Trial counsel testified that he was aware of the supreme court rule requiring trial court judges to file reports with the Tennessee Supreme Court on all first degree murder cases following the conclusion of the case. Trial counsel testified that he reviewed the report prepared by the trial court judge in the petitioner's case, and he submitted corrections to the trial court judge as to some information contained in the report, although late. Trial counsel testified that he was aware that the purpose of the reports was to help appellate proportionality review in death cases.

19

Trial counsel testified that he did not represent the petitioner in his direct appeal. He acknowledged, however, that he successfully preserved for appellate review (1) the issue regarding the state eliciting from the mitigation witnesses information about prior crimes not relied on by the state as aggravating circumstances; and (2) the issue regarding instruction given to the jury on the victim's use of self-defense. Post-conviction counsel introduced a transcript of the instructions given to the petitioner's jury during both the guilt and penalty phases into evidence at the hearing.

The petitioner's maternal aunt, Georgia Baptist, a resident of Memphis, testified that when the petitioner was sixteen or seventeen years old he showed up at her home one night bleeding from over his right eyebrow and saying that he and his father had gotten into a fight. Ms. Baptist did not call the petitioner's parents, but instead cleaned the petitioner up and let him spend the night to let everyone "cool off." Ms. Baptist testified that the petitioner's mother was later angry with her for not calling to tell her where the petitioner had been that entire night.

Nathaniel Wilson testified that he had known the petitioner since the second grade, and years later, they became close friends. Mr. Wilson stated that he knew the petitioner as Vincent Gardner in elementary school; however, around the eighth grade, the petitioner changed his last name to Sims. Mr. Wilson described the petitioner as "a very energetic child. He was kind of a skinny child. Big smile . . . kind of quiet." Mr. Wilson recalled that the petitioner's size was "[s]maller than average" and stated that children would "pick on him." When he and the petitioner became close friends, which was around the ninth grade, they lived close to each other and frequently played basketball together. Mr. Wilson, who played the clarinet, was also in the band with the petitioner, who played the trumpet.

During his friendship with the petitioner, Mr. Wilson often visited the petitioner's home and became acquainted with the petitioner's parents and brother. According to Mr. Wilson, the petitioner had a "strained" relationship with his father, who was often absent from the home, and he sometimes could "sense a hardship" between them. In addition, he recalled witnessing the petitioner argue with his father, mainly over the petitioner doing his household chores. He said that the petitioner's father got mad if the petitioner did not do his chores or did not do them the way he wanted them done. He further said that the petitioner would "honestly" forget to do his chores because of school, homework, and the many other things that he had to remember. Mr. Wilson testified that the petitioner's father loudly yelled when he got upset, and it was "kind of scary." He further testified that the petitioner was upset and saddened after his father yelled at him, and the petitioner "never felt like [the petitioner's father] was pleased with anything that he ever [did]." Mr. Wilson recalled an instance when the petitioner, who was crying, came to Mr. Wilson's aunt's home after he had argued with his father. The petitioner characterized his father as an alcoholic to Mr. Wilson and told him

that his father had a seizure once when he had been drinking. The petitioner also told Mr. Wilson that, when the petitioner was in the tenth grade, his father had pointed an unloaded gun at him.

According to Mr. Wilson, the petitioner's father praised the petitioner's brother because he was a "track star" and had "lots of trophies." Mr. Wilson said that the petitioner's parents displayed the petitioner's brother's trophies in a "prominent position" in the living room. Mr. Wilson could not recall the petitioner's father ever praising the petitioner, but he did remember that the petitioner had a newspaper clipping which had the petitioner's picture and a trophy for winning a dance contest. Mr. Wilson testified that the trophy and newspaper clipping were not in the same location as the petitioner's brother's trophies. He said the petitioner's items were on the right side of the room and his brother's were on the left side. The newspaper clipping was in a glass picture frame, but not the trophy.

Mr. Wilson found out that someone had shot the petitioner back in 1990 when he went to the petitioner's home looking for him. The petitioner's family told him that the petitioner was in the hospital, and the petitioner's mother explained that medical personnel had to revive the him. After the petitioner recovered from the shooting, he described to Mr. Wilson the circumstances surrounding the shooting and his recovery. According to Mr. Wilson, the petitioner said that "when [the petitioner] was in the hospital [and] the doctors [were] operating or when they [were] just caring for him . . . sometimes [the petitioner] just felt like giving up." Mr. Wilson described that the petitioner appeared "[s]addenend" while he discussed his shooting.

Mr. Wilson admitted that he was the petitioner's co-defendant in a 1990 criminal matter. Regarding the circumstances of that matter, Mr. Wilson said that he was driving to a dance at Oakhaven High School, with the petitioner in the passenger seat and a cousin and friend in the backseat, when they encountered a vehicle with "some more guys . . . coming from the opposite direction in the parking lot." Mr. Wilson said the men in the other vehicle were staring at the petitioner, but he could not remember whether the men exchanged words. The other vehicle contacted the vehicle that Mr. Wilson was driving, and subsequently, the petitioner "let the window down and fired two shots at the vehicle."

Mr. Wilson admitted that he and his companions had been drinking malt liquor that night, but he could not remember if they had smoked marijuana. Mr. Wilson stated that he became aware of the petitioner drinking alcohol while they were teenagers. The petitioner's drinking habits increased when he was around nineteen years old. According to Mr. Wilson, they usually drank alcohol Friday through Sunday.

Mr. Wilson served time at the Shelby County Correctional Center because of the

charge he shared with the petitioner. Mr. Wilson described the jail conditions as "horrible." He recalled witnessing a "[thunderdome]" where "the tougher guys or the guys who [had] been [there] maybe longer than some of the other guys . . . would basically just wrestle and . . . would . . . assault some of the guys who just came in or [had] not long been in." He stated that the thunderdome injured inmates, and occasionally, inmates had to go to the hospital after participating. Mr. Wilson testified that he also witnessed guards beating inmates for being insubordinate.

The defense team did not call Mr. Wilson to testify at the petitioner's trial, and he stated that had the defense team asked him, he would have testified. At the time of the petitioner's trial, Mr. Wilson resided in Texas, but he said that he had family that could have found him had the defense team contacted them. He testified that, at the time of the trial, he had "turned [his] life around," was working and active in a church in Texas. He said that he counseled youth in the church and tried to help them overcome their problems. Mr. Wilson said he was willingly testifying at the post-conviction hearing.

Brian Mitchell, the petitioner's cousin, testified that he was incarcerated at the Northwest Correctional Complex in Tiptonville, Tennessee. He did not spend much time around the petitioner until 1996, when he was around sixteen or seventeen years old. During that time, the petitioner and his wife were divorcing. According to Mitchell, the petitioner did not want to divorce his wife and instead wanted to have an "open relationship," which meant that they would see other people. Mitchell stated that he and the petitioner were drinking St. Ives malt liquor, which they did every day, when they discussed the petitioner's marriage. Besides St. Ives, they also drank Hennessy gin. He said that he, the petitioner, and another person would drink a fifth of Hennessy at a time on "Monday, Tuesday, Wednesday, [and they would] probably lay out until about Friday." Mitchell saw cocaine around the petitioner, but denied ever seeing the petitioner use it.

Mitchell was with the petitioner on the night they burglarized the victim's home. Mitchell testified that he and the petitioner had been drinking St. Ives that night. Mitchell also smoked marijuana that night and said that the petitioner "took a couple puffs off of it, but [Mitchell] was really smoking it." Using a sketch of the homicide scene, Mitchell marked where in the victim's carport the petitioner parked Ms. Maxwell's car that night. He also stated that the petitioner parked the car facing toward the carport.

The victim returned home while the petitioner and Mitchell were burglarizing his home. Mitchell said that he and the petitioner ran out the side door, which opened to the carport. When they got outside, they saw that the victim's truck "had [them] backed in," and Mitchell could not get his vehicle out of the carport. Mitchell said that he got in the driver's side of the victim's truck so that he could move it, and the petitioner was in the passenger's

22

side of the truck. Mitchell further said that they were trying to find the truck's emergency brake so they could "push the car out of gear so [they] could leave the residence." While they were searching for the emergency brake, the victim came to the carport door with the keys to the truck and "a silver or chrome pistol." According to Mitchell, the victim stated, "'You forgot the key. Come get the keys. You forgot the key.'" Mitchell stated that the petitioner looked "scared," and the petitioner ran "around the far side of . . . [Ms.] Maxwell's vehicle." Mitchell testified that the victim backed into his home attempting to bait the petitioner, and the petitioner ran into the victim's home.

Mitchell did not go back into the victim's home and heard gunshots while he was outside. Before this night, Mitchell had heard the sounds of ".22" and ".380" guns being fired and stated that he first heard a ".380." After he heard the gunshots, Mitchell saw the petitioner come out of the house holding his side. He stated that the petitioner told him that the victim had shot him and threw him the keys to the victim's truck. Mitchell could not recall how long the petitioner was in the victim's house, but stated that "it seem[ed] like as soon as [the petitioner] entered the house he started shooting." Mitchell moved the truck, and he and the petitioner immediately left. After they left, the petitioner dropped Mitchell off at his fiancée's house.

Mitchell admitted that he lied in his statement and when he testified at trial that the petitioner told him that he had to kill the victim because the victim saw his face. When asked why he lied, Mitchell responded that he was "scared, mad, [and] frustrated." Mitchell made his statement while the police were interrogating him, and he testified that the police told him that the petitioner "was downstairs . . . putting [the crime] on [him]," which made him feel "[b]ad."

Mitchell's court-appointed attorney spoke with the prosecutors in the petitioner's case twice. During a conversation with a prosecutor, Mitchell's attorney left the room after advising Mitchell to keep whatever he and the prosecutor discussed between them. Mitchell stated that the prosecutor offered him dismissal of the murder charge and less jail time if he would testify against the petitioner. Mitchell further stated that the prosecutors advised him that they were "going to try and get [the petitioner fifteen] years and give [Mitchell] four years." Mitchell again spoke with a prosecutor who offered him thirty years for the burglary charge and dismissal of the murder charge. Mitchell pleaded guilty to burglary, and the court sentenced him to thirty years. Mitchell stated that at the petitioner's trial he testified that the prosecution did not offer him any deals because he was "trying to protect" himself.

Mitchell admitted that, as a juvenile, he received convictions for theft of a vehicle $10,000 or more, aggravated assault, criminal attempt, possession with intent to sell fourteen pounds of marijuana, and possession of a pistol.

23

On cross-examination, Mitchell testified that he had not spoken with his attorney since he had been back from the Northwest Correctional Complex. Mitchell said that he knew that perjury was "[w]hen you swear something you lie about," and a possible consequence is receiving more jail time. Mitchell stated that he read the trial transcript. However, when asked when he read it, he said that he had not read the transcript and had only read his "statements and all that."

Mitchell admitted that, at the trial, he did not tell the jury that the victim was standing in the carport doorway jangling keys and holding a pistol. He explained that he did not tell the jury because he "was mad . . . [and] frustrated . . . because [the petitioner] tried to put what he did on [him] and [he] wanted that murder charge dropped." Mitchell also admitted that during the trial, he testified that he saw the victim in the hallway of his home, but did not get "a good look at him[.]" Mitchell agreed that he also testified at trial that he knew the victim "'had thrown his hands up so he didn't have [anything] in his hands.'" During the trial, Mitchell also stated that he did not see a weapon in the victim's hands. Mitchell stated that his testimony at trial was incorrect, and "when [he] made that statement [he] was scared and most of [it] ain't [sic] valid."

Mitchell agreed that he testified during the trial that he ran through the victim's living room and kitchen to get out of the side door, and he passed within two inches of the victim, who had his hands in the air. He also agreed that he testified that the victim did not try to stop or grab him. Mitchell said that his trial testimony that the victim did not threaten him with a weapon was incorrect, and the victim threatened him with a weapon but did not shoot at him. Mitchell agreed that his testimony that the petitioner was in the room while he was running out of the victim's house and that the petitioner also ran out of the house was correct. He further agreed his testimony that he and the petitioner were unsuccessful in trying to move the victim's jeep, which was blocking Ms. Maxwell's car in the driveway, was correct. Mitchell stated his testimony that he tried to find the emergency brake so that he could push the truck out of the way, and that he had put the television that he and the petitioner had stolen from the victim in Ms. Maxwell's car was likewise correct. He denied that his testimony that he was alone outside for three to four minutes while the petitioner was still in the house was truthful and said that both he and the petitioner ran outside. Mitchell said that he lied while testifying at trial because he "was only thinking about [him]self when [he] was talking to the jury." Mitchell claimed he was truthful when he testified that while he was outside, he did not hear anything that was going on inside the victim's home. Mitchell stated that his testimony on the day of the burglary that he saw a bulge in the petitioner's pants was true; however, he further stated that he did not see the petitioner's gun the evening before the burglary. Mitchell said that his statement in the transcript that he had seen the petitioner's ".22 with [a] long, long barrel [and] a brown handle . . . earlier on April 5, 1996" was correct.

24

Mitchell also said his testimony that he did not see the petitioner with the gun inside the victim's home but saw the petitioner with a chrome .380 pistol after he came out of the house was also correct. He denied his testimony that the petitioner came out of the house and said he could move the truck was correct, and he stated that the petitioner had been shot when he came out of the house. Mitchell stated it was true that the petitioner ran back inside the house after he could not move the victim's Jeep and that he heard the petitioner yelling, "'[G]ive me the keys, mother f*cker, give me the keys.'" When asked about his trial testimony that the petitioner did not have a gun when he came out of the house and tried to move the Jeep, Mitchell said that the petitioner did not have a gun "period that night." He explained that the bulge that he noticed in the petitioner's clothes was his pager. Mitchell stated his testimony that he did not see the petitioner take a gun with him when he went back inside the house was correct. He further stated his trial testimony that he did not hear the victim say anything was untrue, but his testimony that he heard the petitioner say, "'[G]ive me the mother f*cking keys'" was true. He also said that he testified truthfully at the trial when he stated that he heard "eight or nine gunshots" after the petitioner ordered the victim to turn over his keys. Mitchell stated his testimony that "the moment [the petitioner] entered the house that's when they started shooting," and his testimony at trial that the petitioner was in the house "[a]bout a minute" after the gunshots were true.

Regarding the events after the shooting, Mitchell admitted that his trial testimony stating that the petitioner ran out of the house with a chrome pistol in his hands and holding his side saying that he had been shot was truthful. He later testified that the petitioner told him he had taken the chrome pistol from the victim. He further admitted that his testimony that the petitioner threw him the victim's keys, which the petitioner had gone back inside the house to get, and told him to move the Jeep was also truthful. Mitchell testified that his trial testimony that he moved the Jeep after the petitioner gave him the keys and then got back in Ms. Maxwell's car, with the petitioner driving, was correct.

Mitchell had already spoken to the police before he testified at the petitioner's trial, but he said that "[s]ome of the information is not true on my statement that they had got [sic] from me." He denied that the petitioner was trying to kill him contrary to his previous testimony, under oath, that the petitioner had threatened to kill him if he testified against the petitioner. Mitchell admitted that the petitioner told him, "'[D]on't say a mother f*cking thing to nobody [sic]." He stated that his testimony that the petitioner told him "'if he don't go home, ain't nobody [sic] going home" was untruthful. Mitchell initially said that he did not remember testifying that the petitioner told him that he "was going to kill [him] when [he got] to the penitentiary" and that he only testified that there was "a rumor going around that [he was] a snitch." However, when refreshed with the trial transcript, he admitted that he did tell the jury that the petitioner threatened to kill him and that his testimony in that regard was truthful.

25

Mitchell stated that he did not kill the victim. He said that the petitioner was his cousin, and he felt bad about what happened and the petitioner getting the death penalty. He agreed that he lied about receiving a deal during the trial. When asked why he lied so much, Mitchell responded that he "was just trying to protect, save himself." Mitchell admitted that he was still trying to protect and save himself. According to Mitchell, the prosecutor with whom he made his deal "told [him] what to say," and Mitchell agreed that he went in front of the jury and "lied [his] little head off." He did not tell his attorney that the prosecutor told him how to testify and said that his attorney thought he was being truthful when he testified.

On redirect examination, Mitchell clarified that both he and the petitioner were in the victim's house originally and both of them ran out of the house when the victim returned home. He said that the victim did not threaten them until they were outside, and the victim was standing in the carport doorway with a gun. Mitchell stated that he was seventeen years old when the authorities charged him with this burglary. He further stated that he was "very much" scared of going to prison, and this case was his first time testifying. Mitchell said that after he testified, the petitioner called him a snitch by writing "Brian Mitch is a snitch" on a wall in the jail. He explained that being a snitch meant "[t]hat you're telling on somebody." When asked if there was any advantage to him for testifying at the post-conviction hearing, Mitchell responded, "No, ain't nothing [sic] in it for me."

Naomi Gardner, the petitioner's aunt, stated that she testified at the petitioner's sentencing hearing. Around eight or nine o'clock on the night before the sentencing hearing, the petitioner's mother notified her that she had to testify at the hearing around ten o'clock the next morning. She did not speak with trial counsel or anyone associated with trial counsel before she testified.

Naomi[2] was around the petitioner's mother while she was pregnant with the petitioner, and the petitioner's mother lived in the same home as Naomi when the petitioner was born. Naomi testified that when the petitioner's mother was around fifteen years old she began having seizures, and she had them while she was pregnant with the petitioner. Naomi recalled that the petitioner was born prematurely at eight months and weighed between five and six pounds. The petitioner had jaundice and was hospitalized for about a month after he was born. She described the petitioner as healthy after he left the hospital except frequent vomiting until he was approximately one-year-old. Naomi said that the petitioner did not "gain weight the way that babies should" and "was always small framed." She also said that

---

[2] Because Naomi Gardner and Mary Gardner both testified at the hearing and have the same last name, we will refer to them by their first names to avoid confusion. We intend no disrespect by doing so but wish to avoid having to repeatedly refer to these individuals by their full names.

the petitioner slept like a normal baby, but he cried "[s]poiled cries" because he liked people to hold and rock him. Naomi said that the petitioner had "never been a big eater"; however, he did eat healthy foods and enjoyed eating certain things. As a child, the petitioner was not very outgoing and stayed inside his house most of the time. She said the petitioner was not a "run around person" and was not talkative either. Naomi later testified on cross-examination that the petitioner was a good child "as far as [she] could see," who got along with his family. She said that he adored his brother and had a "very close" relationship with him.

When the petitioner's mother brought the petitioner home from the hospital, they lived in the Claiborne Homes area. Thirteen people lived in their three bedroom, one bathroom home, which also had a kitchen, living room, and pantry. Other than the petitioner's mother, the petitioner, and Naomi, the petitioner's brother, uncle, three additional aunts, and five cousins also shared the home. The petitioner's mother received a subsidy for food in addition to welfare payments, which other members of the household also received. The petitioner's father also lived with his mother in Claiborne Homes. Naomi described Claiborne Homes as a "rough" and impoverished neighborhood with "[a] lot of crime." When the petitioner was two, he and his mother moved from Claiborne Homes to Crump Avenue. At their new home, around five people were living in a two bedroom, one bathroom home. The petitioner's parents married when he was four, and the petitioner's family moved to the Whitehaven area of Memphis.

Naomi recalled when the petitioner was shot and stated that she went to visit him in the hospital about two hours after he was shot. When she arrived at the hospital, the doctors had already performed surgery on the petitioner, and the petitioner was in the intensive care unit. Naomi was present when the doctors told the petitioner's mother that "it looked like [the petitioner] wasn't going to make it, [and] they couldn't remove the bullet that was in his body." She said that the doctors took her and the petitioner's mother to the hospital chaplain to pray.

Naomi stated that she knew the petitioner's father well and had seen the petitioner interact with his father. Naomi witnessed the petitioner tell his father that someone was picking on him, to which his father replied that the petitioner "needed to learn how to fight and take up for himself." Naomi also witnessed the petitioner's father tell the petitioner that "he needed to eat more, that he was too little[, and] should get bigger to play sports." According to Naomi, the petitioner's father compared the petitioner with his brother, commenting that the petitioner's brother was bigger and that he wanted the petitioner to be more like his brother and play sports.

Naomi recalled an incident, when the petitioner was around seventeen or eighteen years

27

old, where the petitioner came home with some friends and was listening to music with the volume turned up loud. The petitioner's father asked the petitioner to turn down the volume, and the petitioner "got a little smart mouthed with him." Thus, the petitioner's father pushed the petitioner down to the ground, causing the petitioner to scrape his elbow.

Naomi testified that while she and the petitioner's mother were growing up, their parents exposed them to alcohol. Both of her parents consumed alcohol, and her mother had a drinking problem. Naomi remembers her mother drinking when Naomi was as young as three or four years old. She said that she saw her mother get drunk every day and frequently pass out. She further said that the drinking prevented her mother from providing dinner for the family. Naomi testified that her brother also had a drinking problem and was an alcoholic. In addition, she said that she had seen the petitioner's father get so drunk that he would pass out. Naomi stated that three of her nieces were alcoholics, and three of her nieces were addicted to drugs.

The petitioner, along with his mother, lived in Naomi's father's home until the petitioner's parents were married. Naomi stated that the petitioner was close to her father, who was his grandfather. She further stated that the petitioner called his grandfather "daddy" and called his father by his first name. The petitioner's grandfather died in 1986, and Naomi stated that his death affected everybody; however, she did not notice anything unusual with the petitioner after his grandfather died. She said that the petitioner was quiet as she expected.

Naomi testified that had the petitioner's trial counsel asked her the questions that post-conviction counsel asked her, she would have answered just as she had at the post-conviction hearing.

Mary Gardner, the petitioner's maternal aunt, stated that she testified at the petitioner's sentencing hearing. Mary further stated that the petitioner's trial counsel did not contact her before she testified, and she learned that trial counsel intended to call her as a witness while attending the petitioner's trial the day before. Trial counsel told Mary that he was going to call her as a character witness to testify about what she knew about the petitioner. She said that the defense team never asked her about the petitioner's upbringing, character or background.

Mary recalled that the petitioner's mother had epileptic seizures "[p]robably every three months" while she was growing up. She stated that besides having high blood pressure, the petitioner's mother had a normal pregnancy. She and the petitioner lived in the same home with her after he was born, and she recalled that thirteen people were living in their three-bedroom home. When asked how thirteen people fit in the three-bedroom home, Mary replied, "We just got in the bed. Wasn't no [sic] certain bed. Everybody just got in the bed.

28

. . . We didn't have assigned beds. Wherever we laid down that's where we were." Mary corroborated Naomi's testimony that when they moved from Claiborne Homes, eight people -- her father, three sisters, a brother, the petitioner, and the petitioner's brother -- shared a two-bedroom home on Crump Avenue until the petitioner's parents were married and moved their immediate family to Whitehaven.

The petitioner was born prematurely and "had a lot of problems." According to Mary, the petitioner could not digest his milk and cried a lot, which caused them to frequently take him to the Wellington Clinic for treatments. As a baby, the petitioner was slow to gain weight, "tiny,"and did not "have any fat on him." Mary stated that while growing up, the petitioner was a loner who did not have many friends and kept to himself. He was not talkative, and he entertained himself by playing with his toys. Mary said that the petitioner did not complain and did not talk about anything that may have been bothering him.

Mary testified that the petitioner and his father did not interact much, and she could tell that the petitioner was afraid of his father. She had never seen the petitioner and his father argue and explained that, unlike his father, the petitioner was not "a talkative argumentative person." Mary stated that the petitioner's father "was the person that gave orders and you had to do what he said." She further stated that if someone did not do what the petitioner's father ordered, then he would subject them to "a lot of verbal abuse[,] . . . mean talking, cursing, [and] stuff like that." She said that the petitioner's father would yell, and he was "very loud." According to Mary, the petitioner did not look happy when he was in his father's presence and knew not to respond when his father verbally abused him.

Mary said that the home that the petitioner lived in with his parents and brother was "immaculate." She explained that the petitioner's father had

> a lot of orders. [The petitioner's family] had to follow certain guidelines about the house. They couldn't just be themselves. They had to just follow whatever he said to do in the house. Cleanliness, that was a must. They couldn't have anything laying around. They couldn't eat and just be kids, just do what kids do and that's make a mess. They couldn't do that kind of stuff.

She further explained that the petitioner's father left several notes around the house with reminders such as to clean up after themselves and turn off lights that were not in use. According to Mary, the petitioner's father was frequently at work and his sons would not see him much. Mary had never seen the petitioner's father act affectionately or offer praise toward the petitioner or the petitioner's brother.

From 1979 through 1996, Mary was a correction officer at the Shelby County Penal

Farm.  As a correction officer, Mary had direct contact with inmates.  She stated that during the time that the petitioner was incarcerated at the penal farm, the facility's conditions were horrible, it was understaffed, and overcrowding and gangs were problems.  Rapes, riots, and several suicides occurred at the facility while the petitioner was an inmate.  In addition, several types of drugs and inmates who had HIV, tuberculosis, and hepatitis were in the facility.  Mary witnessed the thunderdome while she was an employee at the penal farm.  She stated that the thunderdome was "when the inmates get into like a wrestle mania and they all congregate in the area and they just fight to the death."  Mary recalled that the thunderdome caused several injuries and much bloodshed.  Inmates suffered "busted heads" and were severely beaten to the point where they had to have an ambulance take them from the facility.  Mary left her employment at the penal farm after she witnessed an inmate being killed.

Sammie Lee Netters, Jr., an inmate at the Northwest Correctional Complex, testified that he had known the petitioner since grammar school.  Mr. Netters described the petitioner as a "complete introvert" while they were growing up and said that the petitioner was not "extremely social" with others.  He said that the petitioner would place a "two pronged defense" up for himself.  Mr. Netters said that the first prong was a physical defense, meaning that the petitioner "would always try to keep enough distance between himself and other people unless it was absolutely necessary that they had to be close to him."  The second prong, which was mental, consisted of the petitioner being introverted and not becoming emotionally attached to anyone but his mother and girlfriend.

Besides being the petitioner's friend, Mr. Netters was the petitioner's brother's friend.  Mr. Netters stated that from the time he was around nine years old, he was at the petitioner's home "[p]ractically every day" while they were growing up because he played football and ran track with both the petitioner and the petitioner's brother.  Mr. Netters recalled that the petitioner had an "estranged" relationship with his father and thought that "the communication that most fathers and sons would have . . . was [not] there."  He also recalled that the petitioner "loved his mother to death."  Mr. Netters observed the petitioner's mother to be loving and protective toward the petitioner.

Mr. Netters said that he began to drink alcohol with the petitioner when they were twelve years old.  They drank as many quarts of malt liquor as they could, and they increased their consumption as they got older.  Mr. Netters denied smoking marijuana but said that the petitioner occasionally smoked it.  When Mr. Netters was thirteen, his family moved out of the neighborhood, and he did not get to see the petitioner as frequently.  He occasionally saw the petitioner during junior and senior high school; however, he did not have "physical contact with [the petitioner] on an intimate level" until they were both incarcerated in the county jail.

Mr. Netters said that when the petitioner arrived at the jail, the inmates had "complete

30

control of the jail." He went on to explain that

> [b]ecause [the inmates] outnumbered the correctional officers or deputy jailers
> maybe 300 to 1 they assumed that the easiest way to control the jail would be
> through one or a group of [inmates]. So, they gave [the inmates] free access to
> do whatever [they] thought was necessary to maintain order and discipline.

Mr. Netters had a position of leadership, and the correction officers designated him to ensure a group of pods "ran smoothly." According to Mr. Netters, the correction officers entrusted this responsibility to inmates that had a "barbaric mentality and could handle things physically and could control people." Mr. Netters said that no gang activity was going on in the jail because gangs had not yet come to Memphis; however, the inmates sectioned themselves off according to their neighborhoods. He said that powerful inmates could assume control of the group of inmates from their neighborhood, and if a particular neighborhood had "strength or numbers," they could "dominate another neighborhood."

Mr. Netters came from "one of the better neighborhoods" and stated that only three people from his neighborhood were inmates at the penal farm. He said that because his neighborhood was small in number, he and about fourteen other inmates created the thunderdome to break up larger neighborhoods by having its members fight each other. They would get the inmates to fight over privileges for the telephone and television, which was the group's only measure of control. Mr. Netters explained that the inmates could use the phone during a five-hour period, and about 114 inmates would have to share the telephones during that time. The "toughest" inmates would use most of the phone time, and the weaker inmates would fight for the remaining time. According to Mr. Netters, the correction officers would watch and encourage the fights. Inmates "had no other choice except to fight or just say [they did not] want to use the phone." If an inmate chose not to fight, inmates from their neighborhood would beat them up.

When the petitioner arrived at the penal farm, Mr. Netters did not initially recognize him. He said that for the first three weeks after the petitioner's arrival at the penal farm, the petitioner "would be up under a cover on the mattress in the back of the pod where the lights [were] dim all day. The only time he would come out was when [they] had mandatory showers . . . and to go eat. Other than that [the petitioner] was hiding." During a phone call home, Mr. Netters spoke with the petitioner's brother who informed Mr. Netters that the petitioner was in the same facility as Mr. Netters.

After speaking with the petitioner's brother, Mr. Netters went to the middle of the pod and called the petitioner up to him. The petitioner went to Mr. Netters; however, Mr. Netters did not know it was the petitioner "because he still had his . . . Linus blanket around him like

31

he was trying to protect himself with that blanket." Mr. Netters said that he interrogated the petitioner about who he was because the petitioner and his brother had different last names. During Mr. Netters' questioning, the petitioner referred to Mr. Netters by his first name. Mr. Netters found it "strange" that the petitioner "had sat in the pod for three weeks and knew who [he] was and [the petitioner] never let it be known that . . . [he was] the friend [Mr. Netters] used to have when [they were] growing up."

Mr. Netters testified that he had seen the petitioner participate in the thunderdome. He said that, initially, the petitioner would not fight back, and the other inmates would frequently beat up the petitioner. He also said that the petitioner probably got beat up every day during his first three weeks at the penal farm. Once Mr. Netters recognized who the petitioner was, he "instantly brought him into the family[,] which is the gang family for running the jail." Inmates who were initiated into a "hierarchy" within the prison comprised the family. Although they were not related, Mr. Netters began calling the petitioner his cousin to show how "dear" the petitioner was to him. After this, "everyone instantly knew then that [the petitioner] was off limits. He could not be touched." Both the petitioner and Mr. Netters remained incarcerated in the penal farm for six to eight months. Mr. Netters stated that while incarcerated together, "everywhere [he] went [the petitioner] went. Everything [he] did, [the petitioner] did." The petitioner picked up Mr. Netters' bad habits and imitated them and tried to win Mr. Netters' approval.

After authorities released the petitioner and Mr. Netters from jail, the petitioner continued to imitate Mr. Netters and attempted to win his approval. Mr. Netters also continued to protect the petitioner. Mr. Netters and the petitioner drank malt liquor together, and they "consumed a large volume of alcohol in a short period of time on a daily basis." Specifically, they would purchase a case of malt liquor which contained twenty-four one-quart containers and drink it over two and one-half hours. Mr. Netters said they primarily drank malt liquor because it was cheaper; however, they occasionally drank hard liquor as well. The petitioner also occasionally smoked marijuana.

Mr. Netters had the opportunity to observe the petitioner's relationships with women, and stated that the women with whom the petitioner had relationships "controll[ed] every aspect" of the relationship. Mr. Netters said that the petitioner specifically tried to please his mother and his girlfriend and did anything they asked of him.

Mr. Netters testified that after his release, he still engaged in criminal activity, and he involved the petitioner in his crimes. Mr. Netters stated that he worked as a security guard and used his uniform to impersonate a police officer, gain entry into people's homes, and burglarize them. Because the petitioner was not aggressive, Mr. Netters used him as his driver during these burglaries, which Mr. Netters planned and executed by himself. Mr. Netters

32

testified that he and the petitioner committed "around 10" burglaries, but the petitioner had only twice gone inside the houses that he burglarized. Out of the ten burglaries, authorities only caught them once. Mr. Netters claimed that he encouraged the petitioner to become involved in criminal activity, and the petitioner patterned his behavior from Mr. Netters.

At one time, Mr. Netters was in jail with Mitchell. Mr. Netters knew that authorities had arrested Mitchell and the petitioner for murder, and he spoke with Mitchell about the crime. Mitchell told Mr. Netters that

> they had went on a burglary and when they got to the house they were just going there to steal some things. He said someone came home and caught them stealing some things and pulled a weapon out on them, a pistol. [Mitchell] said as soon as he saw the pistol [he] ran. The man shot [the petitioner] or shot at him and a struggle ensued over the gun.

Mitchell also told Mr. Netters that the man told Mitchell and the petitioner that he was going to kill them for stealing his belongings.

Mr. Netters had perjured himself in a previous, unrelated case. He stated that at this hearing, no advantage existed for him to testify the way that he did. He further stated that there was an advantage for him to change his story when he perjured himself while testifying in the other case.

Trezevant Gardner, Sr., the petitioner's half-brother, testified that he was four years older than the petitioner, and they had the same mother but had different fathers. Mr. Gardner's mother raised him and the petitioner in the same home. At the time the petitioner was born, the family was living in Claiborne Homes with their maternal grandfather. Mr. Gardner stated that he and the petitioner had a "daddy relationship" with their grandfather, and the petitioner called him daddy. The petitioner's biological father occasionally visited their home.

Mr. Gardner corroborated the testimony that they moved to Crump Avenue and then to Whitehaven after his mother married the petitioner's father. He stated that his stepfather was strict and left notes directing him and the petitioner to do certain things such as clean the microwave after they had used it. Mr. Gardner recalled that his stepfather required him and the petitioner to sweep the carpet a certain way after vacuuming so that the vacuum print would not be on the carpet. They also had to back out of the room so that they would not leave their footprints on the carpet. He said that he and the petitioner had to do to the same chores on a rotating schedule. He agreed that his stepfather did not like their home to be messy and expected him and the petitioner to be responsible, which he said the petitioner was.

33

His stepfather worked long hours and spent most of his time away from home. The only time the boys spent with him was when they did yard work or took family trips. Mr. Gardner said that because his stepfather was working, he attended neither Mr. Gardner's sporting events nor the petitioner's band performances. His stepfather did, however, attend practices and helped them practice at home. Mr. Gardner recalled that his stepfather drank alcohol and had a gun that his stepfather would fire into the ground on New Year's.

Mr. Gardner said that the petitioner was "very close" to their mother and spent more time with her than he did. He testified that he and his brother had different personalities, and he was more outgoing than the shy petitioner. Mr. Gardner recalled that until the petitioner was six or seven years old, the petitioner had "bad nightmares" and often slept with his parents at night. Mr. Gardner said his stepfather yelled at him and the petitioner, sometimes loudly, and the petitioner "occasionally" cried when his father yelled at him.

Mr. Gardner played basketball, football, and participated in track and field while he was in school. When their family first moved to Whitehaven, Mr. Gardner and the petitioner both tried out for the YMCA track club and ended up joining different teams. When he ran track, Mr. Gardner was close to his coach, who was a "very good" influence on him. Mr. Gardner said that the petitioner did not have anyone outside his immediate family that was a good influence on him. Mr. Gardner's team earned trophies at the end of the season while the petitioner's team did not, and Mr. Gardner said that the petitioner was "a little upset about that situation." He said that he received "[l]ots of awards" for his participation in sports. Mr. Gardner had between twenty and thirty trophies that his parents displayed in the living room.

Mr. Gardner stated that the petitioner was smaller than other children the petitioner's age and was picked on because of his size. Other students bullied the petitioner, and the petitioner would come home with busted lips and other evidence that he had been in a fight. Once the petitioner came home with a chipped tooth because "[s]ome guy blindsided him and hit him in the mouth . . . ." One day the petitioner came home with a busted lip and his father asked him what had happened and whether he was at fault. The petitioner had not started the fight, and his father instructed him, "[N]ext time if he puts his hands on you[,] you do anything necessary to defend yourself." The petitioner's father likewise instructed Mr. Gardner to protect himself by doing "whatever it takes." There was a punching bag at their home which Mr. Gardner and the petitioner purchased. Mr. Gardner and the petitioner used the punching bag to teach each other self-defense.

Mr. Gardner stated that when the petitioner was fourteen or fifteen, the petitioner's girlfriend's uncle caught the petitioner and his girlfriend in the bedroom together and told the petitioner's father. Mr. Gardner said that the petitioner initially denied being in the bedroom;

however, when the two families got together to discuss the incident, the petitioner admitted that he had been in the bedroom. After the petitioner admitted that it was him, the petitioner's father struck the petitioner in his face with his hand. The petitioner ran away to his aunt's house for a week, during which time the petitioner's family did not know where he was. The petitioner eventually returned home, and according to Mr. Gardner, the incident affected the trust between the petitioner and his father. Mr. Gardner said that the petitioner was upset and scared after the incident.

Mr. Gardner and the petitioner began drinking malt liquor together when they were teenagers. Mr. Gardner denied that he was an alcoholic and stated that back then they would only drink more than one quart of malt liquor in one sitting "[e]very blue moon." According to Mr. Gardner, "because [of the petitioner's] body weight he couldn't handle [the] . . . malt liquor" and would become light-headed. Mr. Gardner testified that liquor also caused a change in the petitioner's body movements, speech, and temper by lessening his inhibitions.

While they lived in Whitehaven, Mr. Gardner and the petitioner hung out at Gaston Park, which Mr. Gardner described as "[l]ike the projects . . . ." They visited Mr. Gardner's friend and played basketball. On July 3, 1990, they were in Gaston Park drinking and playing basketball. Over the course of three or four hours that night, they drank a couple quarts of malt liquor. The petitioner continued to drink while Mr. Gardner played basketball. The petitioner was sitting in the picnic area with his cousin, and some men began to shoot fireworks toward them. A confrontation occurred, and one man that was shooting fireworks went to get his cousin who had a gun. The man pointed the gun, which was a .22, at Mr. Gardner's head. The petitioner hit the man's hand, the gun went down, and the man then pointed the gun at the petitioner. The petitioner stood in front of Mr. Gardner to protect him, and the man discharged the gun at the petitioner; however, the gun misfired. The man fired the gun again, and this time it discharged and a bullet struck the petitioner's left shoulder. The shooter ran away, and Mr. Gardner and others attempted to apprehend him but were unsuccessful. Mr. Gardner said that the petitioner, looking "dazed" and "sluggish," told Mr. Gardner that the man had hit him with the bullet. Mr. Gardner testified that the petitioner was bleeding "[v]ery little at the time."

Mr. Gardner and other people drove the petitioner to Methodist South Hospital, which was about fifteen minutes away from the park and close to the petitioner's home. Methodist South Hospital was unable to treat the petitioner, so they transferred him via ambulance to Methodist Central Hospital.[3] Mr. Gardner followed the ambulance to the hospital where doctors performed surgery on the petitioner. Mr. Gardner had notified his parents about the petitioner's injury, and they met Mr. Gardner at the hospital. Mr. Gardner worriedly waited

---

[3] Methodist Central Hospital is now Methodist University Hospital.

to see if the petitioner's surgery was successful but was unable to see the petitioner until the next morning. He described the petitioner as looking "woozy" and having tubes in him. Mr. Gardner visited his brother every day during the week or so that he was hospitalized. Mr. Gardner testified he did not notice any change in the petitioner, such as being more or less fearful, truthful, or isolated, after the petitioner returned home from the hospital.

Mr. Gardner visited the petitioner while the petitioner was an inmate at the Shelby County Jail. Mr. Gardner testified that this was the petitioner's first time being away from home, and the petitioner looked "kind of embarrassed or . . . ashamed." Mr. Gardner also visited the petitioner when the petitioner was an inmate at the penal farm and said the petitioner looked the same as when he visited him at the county jail.

Mr. Gardner stated that the petitioner's defense counsel contacted him about testifying at the petitioner's trial "about a week" before the trial. Defense counsel actually spoke with his wife, who delivered the message to Mr. Gardner. Mr. Gardner said that he never personally spoke with anyone from the defense team. Mr. Gardner testified that he attended the petitioner's trial; however, no one talked to him about testifying, and he did not know that he was going to testify until counsel called him to the stand. There was no pretrial preparation for his testimony, and he did not know what he was supposed to testify about. Mr. Gardner testified that had trial counsel asked him if there was anything about the petitioner's character and background that he wanted the jurors to know before they sentenced him, he would have answered that the petitioner is "a loving person. Giving. And doesn't deserve to die because he has kids."

Dr. Pamela Auble, a clinical neuropsychologist, testified as an expert in neuropsychology. Dr. Auble was licensed in Tennessee and had been practicing since 1985. To prepare for her testimony and help form the basis of her opinion, Dr. Auble reviewed the petitioner's school and medical records, presentence report, and the Tennessee Supreme Court's decision in this case. Dr. Auble also met with the petitioner for an hour and forty-five minutes on July 31, 2002, to interview him and perform a psychological evaluation on him. She said that the petitioner was cooperative during the interview and evaluation.

During the interview, Dr. Auble learned about the petitioner's early background, including his living arrangements, his mother's medical condition, and family composition, which the other witnesses had testified about earlier. Dr. Auble stated that she learned, from previous testimony at the post-conviction hearing, that the petitioner was small for his age when he was growing up, and he wore clothes that were two sizes smaller than the other children. Dr. Auble further stated that because he was smaller, the petitioner was an "easy target" and was picked on by other children. From what others had said about the petitioner and Mr. Gardner, Dr. Auble understood that the petitioner was not as athletically talented as

Mr. Gardner.

Dr. Auble also learned, through the previous post-conviction testimony, that the petitioner's father was "someone who [was] a pretty critical and demanding individual. That he was someone who did not praise [the petitioner] and often criticized him." She went on to say that the witnesses described the petitioner's father "as a . . . fairly rigid individual who had rules for how the children should conduct themselves, [and] standards for how clean the house should be kept." The petitioner told Dr. Auble that his father did not attend his band performances or other school activities. Dr. Auble learned that the petitioner's father worked long nights at the post office until the petitioner was ten, at which time he began working days.

Dr. Auble discovered that the petitioner repeated the first grade because he "apparently didn't make any progress in mathematics"; however, "he did somewhat better" during his second year of the first grade. From the third grade through the fifth grade, the petitioner made average grades. Achievement tests suggested that the petitioner excelled in areas that required "rote learning," which she described as "spitting back what you've learned; things like spelling, . . . math computation, [and] learning his tables." She stated that he tested the lowest in areas where he had to apply knowledge such as reading comprehension and applied math problems. The petitioner's test scores in junior high school were much lower than his previous scores, and his test scores in high school were also substantially lower.

Dr. Auble opined that based on his grades and school records, the petitioner did not do as well academically during his transition from elementary school to a new junior high school. She stated that this may have been because in junior high and high school the petitioner had to do more reasoning and use what he had learned. She said the petitioner remained small in junior high school and did not begin to grow until late adolescence, which again caused the other students to pick on him. During junior high and early senior high school, the petitioner had social trouble and began getting into fights. Until the petitioner was in the tenth grade, he had a good attendance record at school. Mr. Auble testified that the petitioner's poor performance despite his good attendance suggested that although he was present, the petitioner could not use the "basic tools" he had learned to "do more of that kind of independent thinking in junior high and high school, particularly high school."

The petitioner continued to take achievement tests in junior high school and began taking proficiency tests in senior high school. Dr. Auble testified that proficiency tests seek to detect whether a student has sufficiently learned "the basics" to graduate senior high school. While in the ninth grade, the petitioner failed the math and language portions of his proficiency test. The petitioner repeated the ninth grade and retook the proficiency exam, this time passing the math section and failing the language section. In the tenth grade, the

petitioner passed the language section. The petitioner failed the eleventh grade due to fights and suspensions. While repeating the eleventh grade the next year, school authorities expelled him.

During the interview, the petitioner told Dr. Auble that when he was around fourteen or fifteen years old, he began drinking malt liquor and smoking marijuana every other day because they calmed him. After high school, the petitioner continued drinking malt liquor. He had worked at fast food restaurants; however, he held a position unloading trucks for Nike, which was a temporary job, the longest. Dr. Auble testified that most of the petitioner's employment was temporary, and he had trouble staying employed because of his record.

Dr. Auble was aware of the petitioner's involvement in the shooting on October 26, 1990, during a dance at Oakhaven High School. On October 30, 1990, authorities arrested the petitioner on charges unrelated to the October 26 shooting, but they later found out that the petitioner was involved in the October 26 shooting. The petitioner pleaded guilty to those charges, and the court used those charges as aggravating circumstances when sentencing the petitioner in the present case. After pleading guilty, the petitioner was incarcerated in the Shelby County Jail until April 1991. Through her preparation, Dr. Auble also learned about the petitioner's relationship with Mr. Netters. In addition, the petitioner told Dr. Auble about the circumstances surrounding his case when a man shot him at the park, which caused him to be hospitalized for six days. Dr. Auble attempted to speak with the petitioner about circumstances surrounding the present case; however, she said that he did not wish to discuss the case with her, and they never discussed it.

Dr. Auble administered a Wechsler Adult Intelligence Scale -III (WAIS-III) test on the petitioner. She described the test as "an individually administered IQ test" and stated that it was "probably the most widely used intelligence test." She went on to explain that the test "consists of . . . [eleven] basic subtests. And there's three additional supplemental subtests. The subtests measure different kinds of knowledge and reasoning. They can be divided into verbal and nonverbal. And you can get IQ scores for both the verbal abilities and the nonverbal abilities." The nonverbal abilities test is also referred to as a performance IQ test. The test generates an individual subtest score and a combination of the scores, which is the full scale IQ.

The petitioner's lowest subtest scores were in vocabulary and mental arithmetic. Dr. Auble stated that the petitioner's scores in these areas were in the second percentile, meaning that "out of . . . 100 people, 98 would have done better than he did." She further stated that the petitioner scored below average, specifically in the ninth percentile, on all of the verbal subtests that tested abstracted verbal reasoning. The petitioner was also in the ninth percentile on general world information, including geography and history.

The petitioner's strongest area, compared with his other scores, was block design where he used red and white blocks to copy red and white patterns. The petitioner was in the 25th percentile for this area, and Dr. Auble stated that copying symbols was a strong suit for the petitioner. The petitioner's weakest areas on the nonverbal subtests were abstract visual reasoning and a test which required him to "take a series of pictures of situations of people doing things and put them into sensible order so that the pictures follow one to the other." She said that these subtests being the petitioner's weakest areas suggested that the petitioner had limited ability to "process information, to abstract material, to understand and to reason." She further explained that

> on the similarity subtests where he is given two words and he's got to come up with similarities between them, the best answers are abstract categories. And [the petitioner] tends not to give those answers but rather to give concrete features or things that are in common as features between the two words rather than an overall category.

The petitioner also had trouble with matrix reasoning, which is an abstract visual reasoning test. She said that the petitioner's test results indicated "that his ability to reason and think where he's got to put things together and come up with overarching categories or come up with solutions that take into account all the pieces of the problem . . . are limited."

The petitioner's final verbal IQ score was 72, and his final performance IQ was 81. Dr. Auble used these subtest scores in a formula and calculated a full scale IQ score. The full scale IQ score gave Dr. Auble an idea of how the petitioner was functioning intellectually. The petitioner's full scale IQ score was 75. She testified that the IQ test scores were structured on a bell curve. She further testified that

> [i]ntelligence in a population has been found to fall in . . . what's called the normal distribution or a bell curve. The . . . middle of the distribution is a score of a 100. And that's the 50th percentile so that the average range is . . . that scores that are clustered around 100: scores from 90 to 109. About two thirds of the population falls within the average range.

> The ends of the bell curve as - - you know, most people are average. Fewer people are above average and fewer people are below average with the tails being the most rare so that [the petitioner's] IQ of 75 would put him at the left-hand end of the bell curve. In other words, 95 percent of the people would fall above his score and 5 percent would fall lower.

The standard deviation, which is the variability around what is an average score, was fifteen, and scores from 85 to 115 are one standard deviation around the mean score, 100.

Dr. Auble testified that under Tennessee law, a person with an intelligence score of seventy or below is considered mentally retarded. Other sources, such as the Fourth Edition of the Diagnostic and Statistical Manual of the American Psychiatric Organization ("DSM-IV"), use different intelligence scores to classify mental retardation. The DSM-IV considers "an IQ of approximately 70 because there is error in the estimates. And so there's about five points roughly of error. So they say that approximately 70, but possibly up to 75 given the error if there are concurrent adaptive deficits in functioning as well."

Dr. Auble also conducted a Wechsler Memory Scale, Third Edition (WMS-III) exam on the petitioner. This exam tested the petitioner's learning and memory. This test is scored the same as the WAIS-III in that 100 is the average, 50th percentile, score, and the scores diminish gradually in both directions. Evaluators norm the tests together so they can compare the test taker's memory and intelligence and determine whether their memory is what they expect of someone with their intelligence.

According to Dr. Auble, the petitioner did "relatively well" at remembering the things that he saw during the WMS-III exam and did "very good" at remembering faces in particular. She stated that the petitioner's "visual memory is low average and about what you'd expect for somebody with his overall intelligence." She further testified that the petitioner's "verbal memory, on the other hand, was not good. His immediate recall for things that he was told, stories and pairs of words, was only at the [1]st percentile. His auditory immediate was 62." The petitioner had trouble remembering what the doctor told him while testing, and Dr. Auble said that only three percent of the people with the petitioner's IQ would perform as poorly as the petitioner did on the auditory immediate memory test, and "only [5] to [10] percent of them would perform as well as he did on the auditory delayed memory." Dr. Auble stated that the petitioner's poor memory scores indicated that learning from experience and understanding things based on what he has heard or known previously would be difficult for the petitioner.

Dr. Auble also did a booklet category test that tested the petitioner's mental flexibility in a frontal lobe test. This test "measures the ability to use information, to come up with general principles and then to take those principles and apply them in a systematic way." Dr. Auble further explained that the test sought to measure whether the petitioner could learn from his experience, abstract principles from his mistakes, if any, and whether the petitioner could put together and understand many pieces of information. The test consisted of the doctor giving the petitioner a visual design and the petitioner coming up with a number between one and four. The doctor would then tell the petitioner whether his number was

correct. The doctor would then give the petitioner another design, and the petitioner must come up with a number between one and four. The doctor, again, would tell the petitioner whether he selected the correct number. Dr. Auble said that she tells the test takers, including the petitioner, that throughout the series of designs there is one idea and that once they get the idea, they will be able to answer every subsequent question correctly.

Dr. Auble stated that the petitioner did well on the first subtest which consisted of Roman numerals. She described the first subtest as "very easy," the second subtest as "pretty easy," and the third subtest as "somewhat more complicated" than the first two. During the third subtest, Dr. Auble performed forty trials with the petitioner. She stated that the petitioner's performance on subtest three "was essentially random." The petitioner made thirty-one errors during subtest three, and she stated that he could not make sense of the information she had given him. Dr. Auble said that the petitioner could get the idea during other subtests; however, if the image changed, the petitioner would lose the idea and give incorrect answers. The petitioner could not "transfer and say oh, this is the same principle, but it's just a . . . different picture." For this subtest, the petitioner performed two standard deviations below the mean score, which was in the impaired range. Dr. Auble testified that the test measured the petitioner's "ability to process information, to abstract from his mistakes, to learn from his experience, to engage in logical reasoning to see how one thing links to the next."

Dr. Auble also administered the Boston Naming Test, which was "a very simple test of just pictures of a common objects, and [the petitioner had] to name them." On this test, the petitioner tested in the impaired range. She stated that the petitioner knew several pictures, but he could not name them. According to Dr. Auble, this indicated that the petitioner had a language production problem because the pictures were "fairly obvious." There were 60 pictures and the average score is 55 out of 60. The petitioner scored a 38, which Dr. Auble said was "unusually low." The petitioner was in the first percentile for this test.

Dr. Auble performed a Delis Kaplan Executive Functioning System Test on the petitioner. This test consisted of subtests which measure frontal lobe functioning. Dr. Auble administered the Tower Test, which required the petitioner to put towers together, and a second subtest which tested abstract reasoning. Dr. Auble explained that frontal lobe function testing evaluates the whole brain "because it involves abstracting information, using it, [and] applying it in a reasonable fashion." The petitioner performed below the first percentile on this test.

The twenty questions portion of the Delis Kaplan test is designed to measure "the ability to link together information to draw conclusions, to abstract information from errors of mistakes, to learn from you experience, [and] to reason in a logical way." Dr. Auble gave

41

the petitioner a page with thirty pictures of things like a train, cow, or banana. Dr. Auble told the petitioner that she had a picture in her mind, and he was to ask her questions to figure out which picture she had chosen. The item that Dr. Auble selected was the picture of a banana. She said that the petitioner first asked whether the picture was of something one could eat, to which she responded yes. The petitioner's next question was whether the item was something that went on a railroad track. Dr. Auble said that this showed that the petitioner "did not take into account that [she] told him it's something you eat because there's nothing that you eat that belongs on a railroad track." She further said that the petitioner continued to ask questions that would not apply to something that one could eat. The petitioner's nineteenth question was whether the item was "a food that is yellow and you peel it," to which Dr. Auble replied yes. The petitioner still did not ask whether the item was a banana, but rather asked whether "it [was] something you cut with." Dr. Auble "worried about how [the petitioner] was doing[,] [a]nd after the end of this test, [she] went and read him the instructions all over again because [she] thought well, . . . somehow he just didn't get it." Dr. Auble performed three additional trials on the petitioner, and he did the same. The petitioner's results on this test were consistent with his results from the booklet category test, the WAIS-III subtest, the petitioner's school records, and the achievement testing done in school.

The petitioner's performance was also consistent with the Third Edition, Woodcock Johnson Test of Achievement which Dr. Auble performed on the petitioner. During Dr. Auble's achievement testing of the petitioner, she found that the petitioner had a "pretty good" ability to read single words, rapidly read simple sentences, and was at the seventh or eighth grade reading level. The petitioner's reading comprehension and ability to use the information that he read, however, was only at a third grade level.

Finally, Dr. Auble administered a Rorschach ink blot test. According to Dr. Auble, the petitioner's results on this test were consistent with the other tests in that the petitioner "tended to give simple answers to simple aspects of the ink blots" which suggested that the petitioner "responds to superficial aspects of situations and doesn't take complexity into account." She stated that the petitioner's responding to the colors on the ink blots suggested that he is an emotional responder because the colored ink blots tend to correlate to emotional responses. She further stated that the petitioner's answers "were not always common answers or usual [which indicated] that [the petitioner] may see the world differently than other people. And [the petitioner] didn't give [her] any humans on the Rorschach which suggests that he may not understand people very well."

Dr. Auble testified that the petitioner seemed to be trying when he took the tests, and she considered the test results to be valid. Dr. Auble performed malingering testing, which tested the effort that the petitioner put forth during the test, and the petitioner scored perfectly. The test consisted of Dr. Auble showing the petitioner fifty pictures and asking the petitioner

if he recognized the pictures. During a second test, Dr. Auble again showed the pictures to the petitioner and asked him if he recognized them. A score of 45 or less on the second test indicates a lack of effort. The petitioner could remember the pictures and scored 50 on the second test, which suggested a good effort. Dr. Auble stated that "even pretty severely impaired people could get almost all of them right or all of them right."

Dr. Auble reviewed trial counsel's July 4 letter to the petitioner in which he attempted to explain the felony murder charge and a problem with identifying the correct victim. When asked whether, given the tests that she performed on the petitioner and the petitioner's performance on the tests, the petitioner could easily understand the language in the letter, Dr. Auble replied that she could not tell scientifically because she did not perform a reading level test of the information contained in the letter. She stated that the letter appeared to be relatively complex. Dr. Auble also reviewed the plea bargain documents and said that to understand the documents, the petitioner would need more explanation than a "normal person." She stated that both the July 4 letter and the plea documents contained language at a higher level than what someone with a third grade reading level could easily comprehend.

In her final Forensic Neural Psychological Evaluation, Dr. Auble stated, "[N]eurospsychologically I concluded that [the petitioner] had impairments in his verbal abilities relative to his nonverbal abilities. I concluded that his intelligence is limited . . . . I concluded that he had difficulty in school such as what we've talked about." The petitioner's deficits in language and verbal knowledge, verbal memory, and verbal attention were associated in the left hemisphere of the petitioner's brain. There were also deficits in functioning associated with the petitioner's frontal lobe. She testified that because the petitioner had difficulty in school and had to repeat grades, some of his deficiencies had been present for a long time. Dr. Auble did not know the etiology of what may be causing the petitioner's deficits in the left hemisphere of his brain and possible deficits in the frontal lobe.

Dr. Auble further concluded that the petitioner's impairments "would have contributed . . . to his behavior at the time of the offense." She stated that the problems with the petitioner's left hemisphere and frontal lobe

> would make [the petitioner] more likely to behave impulsively, to take information in from the world . . . in a way that ignored some aspects of the situation, that he would have trouble connecting up cause and effect some from learning from what he's seen and making a plan to do something next that would be reasonable or rational.

She agreed that the petitioner had deficits in the way he adapted to the world. Drinking alcohol and smoking marijuana would make the petitioner's deficits worse. Dr. Auble

43

testified that she thought the petitioner's impairments were "something that would enter into his functioning at any time including the night of the crime."

On cross-examination, Dr. Auble testified that she interviewed the petitioner before she tested him and got his view of the world by asking him questions, including questions about his background. Dr. Auble did not speak with the petitioner's father or personally speak with any of the witnesses. She stated that, during the interview, the petitioner told her that his father was "nice but strict," and she further stated that the petitioner loved his father. The petitioner also told Dr. Auble that he had never seen his father intoxicated.

Dr. Auble did not read anything about the trial, and the petitioner did not tell her his version of the events. Because the petitioner did not discuss the facts surrounding his case, Dr. Auble was unable to decide the petitioner's competence at the time of the burglary.

Dr. Auble did not diagnose the petitioner and was unaware of any prior diagnosis of mental illness. She agreed that the petitioner's problems in school manifested themselves early in elementary school, and continued throughout middle and high school. The petitioner performed best in elementary school. She stated that the petitioner's problems in school predated when he was shot and when he was beaten up in jail.

Dr. George W. Woods, a neuropsychiatrist, testified as an expert in neuropsychiatry. He stated that he performed a neuropsychiatric evaluation on the petitioner and met with him on three occasions for five to six hours. The petitioner was cooperative during the meetings; however, he was not able to extensively talk about the circumstances of the burglary in this case until the last meeting. To prepare for his testimony, Dr. Woods reviewed prior witnesses' post-conviction testimony, and the petitioner's school, prison, and medical records. He also interviewed the petitioner's family, reviewed a lawsuit filed against Shelby County for the jail conditions during the time the petitioner was incarcerated, reviewed Dr. Auble's neuropshychologic tests and report, consulted with Dr. Auble, and reviewed the state supreme court's opinion in this case.

Dr. Woods testified that the petitioner's mother having seizures and the petitioner being a small baby with eating problems were significant because a mother having seizures while carrying a fetus in utero could possibly cause prenatal difficulties. He explained that

> [s]eizures are . . . an electrical phenomenon in the brain. But they actually have physiological consequences . . . . A seizure is really the overt manifestation of ongoing electric activity.
>
>     . . . .

44

And so the idea that . . . the only time they're having electrical problems is when they have a seizure is incorrect. In fact, a person that is having a seizure has aberrant or unusual electrical activity most of the time. And when a seizure breaks through, it's really a break through phenomenon. It really is an over manifestation of something that's ongoing all the time.

We don't really know necessarily whether this had an impact on [the petitioner's] prenatal and perinatal development. But we do know that his mother had a history of seizures. And we also now are looking at fairly significant neurological impairments.

Regarding the petitioner's father, Dr. Woods stated that the petitioner and his father did not significantly bond before the petitioner was five years old. He further stated that the time before a child reaches the age of five is the most important for developing such a bond. Dr. Woods testified that the petitioner and his father had a "conflicted relationship" because the petitioner's father "worked like a dog" to provide for his family; however, he was also harsh, critical, and rarely praised the petitioner. He stated that the petitioner's living in a three-bedroom home with thirteen people and no assigned sleeping areas early in his life could potentially have caused "chaos and impaired coping mechanisms." The living arrangements did not give the household members "a certain sense of privacy or a certain sense of self . . . it was very chaotic[,] . . . very confusing[,] and very fluent."

Dr. Woods opined that the petitioner's having to repeat the first grade was not a socialization issue, which includes the abilities to socialize, play appropriately, not to interrupt, and follow directions. He stated that it appeared that academic issues, particularly reading, caused the petitioner to repeat the first grade. These academic issues are left temporal lobe issues as noted by Dr. Auble. He stated that until around the fifth grade, the frontal lobes, which will eventually be 35 percent of the brain, are not fully developed in children. During this time, children have the parts of the brain that respond to rote learning. The frontal lobes begin developing when children are ten to twelve years old and impaired lobes can cause developmental impairments and diminished educational abilities.

Looking at the petitioner's school records, Dr. Woods stated that in the first grade, there was a red flag because the petitioner had difficulty reading. The petitioner did rather well with rote learning until the sixth grade, when frontal lobes begin developing and children transition from rote learning to abstract learning. In the eight and ninth grades Dr. Woods said that the petitioner evidently had an impairment in the conceptual abstract part of his brain. According to Dr. Woods, at this point, the petitioner should have been able to do "abstract thinking and more conceptual thinking"; however, this thinking did not "kick in" and the petitioner began having more problems in school.

45

The petitioner was small growing up which subjected him to bullying. Dr. Woods learned from the petitioner's aunt that, while growing up, the petitioner wore clothing two sizes smaller than other children his age. The petitioner told Dr. Woods about the incident when someone beat him up and his father told him to do whatever it took to keep people off him.

Dr. Woods noted "a difficult sibling difference between [Mr.] Gardner who was an excellent athlete with multiple awards and [the petitioner] who was not as adept in any particular field." Dr. Woods did not see any indication of a conscious comparison, but he observed that there was a "comparison of omission." The petitioner's parents having a trophy case for Mr. Gardner and excluding the petitioner's trophy was a "clear separation between the son that was doing very, very well and the son that was less successful." Unlike the petitioner, Mr. Gardner had the influence of his coaches; however, Dr. Woods stated that the thing that most differentiated the brothers was the petitioner's cognitive abilities. The petitioner's impaired cognitive abilities influenced not only people's behavior toward the petitioner, but also the petitioner's ability to access positive role models. The petitioner's frontal lobe impairments prevented him from truly accessing and effectively using outside information.

Dr. Wood stated that the petitioner's use of malt liquor, a fortified alcohol which contains a derivative of formaldehyde in its development process, could have impaired the petitioner's frontal lobes and the cerebellum, which controls the ability to move. The petitioner's using drugs and alcohol during his adolescence affected "the frontal lobe of [his] brain at the time that it is trying to grow." Dr. Wood stated that the petitioner had "the pedigree" for becoming a heavy drinker in that his father possibly had problems with alcohol and because his paternal and maternal grandfathers died of sclerosis of the liver, which frequently occurs because of alcoholism.

Dr. Wood reviewed the medical records from when the petitioner was shot at Gaston Park. Dr. Woods said that the injury was serious, and the petitioner lost consciousness. Dr. Woods noted that in the medical reports, hospital personnel asked the petitioner if he had lost consciousness, and the petitioner responded that he had lost his eyesight. Dr. Woods found this interesting because the doctors had reported that the petitioner lost much of his blood, and his lung had been punctured but not deflated; however, "the idea of him not being able to see was something that [the petitioner] was able to relate rather than the word 'consciousness.'" After he was shot, the petitioner began carrying a gun and experienced traumatic distress symptoms such as having nightmares of being shot and waking up screaming. Dr. Woods stated that, in his opinion, the petitioner also had symptoms of hyperactivity and aroused startle response. Dr. Woods explained the effects on the petitioner, given his neurological

46

impairments, as the petitioner having "a brain that can see every tree but can't tell you it's a forest. [The petitioner] does not see the relationship, the ability to sequence either his behavior or perhaps others' behaviors as well." He went on to explain that the petitioner "often is not able to effectively think his way through problems to solve problems or to kind of sequence his behavior. . . . [H]e isn't very facile with verbal information. . . ." He noted that although the petitioner had good language skills, he had impaired verbal comprehension. Dr. Woods testified that when people "are set up for fight or flight or any type of anxiety, it often impairs [their] ability to register information." He further testified that certain brain impairments may also weaken registration.

Dr. Woods recalled the incident when the petitioner got into a confrontation while going to a dance at a high school that led to the petitioner shooting at the other men. This incident occurred approximately three and a half weeks after the petitioner was shot. Dr. Woods stated that the petitioner described himself as "very hyperactive" during this time, and Dr. Woods said that the petitioner's behavior was "certainly . . . consistent with someone that [was] suffering from traumatic stress[,] . . . totally spontaneous . . . by all indications," and "[a]bsolutlely" disproportionate to the situation.

Dr. Woods testified that the incidents that happened to the petitioner while he was incarcerated at Shelby County Jail in October 1990 caused the petitioner to isolate and withdraw himself. He said that the petitioner recognizing Mr. Netters, who was essentially running the pod, but not contacting him or identifying himself, showed the petitioner's inability to observe a situation, think about it, and sequence his thoughts to create a better circumstance. The petitioner ultimately had a mentor/mentee relationship with Mr. Netters which continued after they were released from jail. The petitioner told Dr. Woods that he looked up to Mr. Netters and thought he was smart and tough. The petitioner said that he had no role models, was isolated from his family, and Mr. Netters was "the worst of the bad people" with whom he hung around and modeled his life after.

Dr. Woods reviewed the mitigation evaluation where the mitigation investigator checked off that the petitioner had dizziness, fainting spells, dropping objects, and suicide attempts as symptoms but also wrote "none" under the symptom checklist. The checklist also had "sinus problem" handwritten on it. Dr. Woods stated that "to any doctor[,] dizziness, fainting spells, and dropping objects would be of clinical importance." Dr. Woods said that it was "very doubtful" that these symptoms related to a sinus problem, and if he had seen this checklist, he would have followed up on the symptoms. He stated that given the petitioner's mother's "history of seizures and having some type of cognitive impairment, you would want to see if there's any genetic history." Dr. Woods said that his initial step would have been to perform a thorough neuropsychological battery which would have allowed him to see the other cognitive impairments from which the petitioner suffered.

47

Dr. Woods recounted the circumstances surrounding the burglary of the victim's home as told to him by the petitioner and as he read in the transcripts. He stated that the petitioner burglarized the victim's home and sought Mitchell's help in carrying a large television. The petitioner used his girlfriend's car and picked up Mitchell so that Mitchell could help him. While they were burglarizing the victim's home, the victim returned, parking his vehicle in the driveway and blocking in the petitioner's girlfriend's car. The victim entered his home surprising the petitioner and Mitchell, who had run outside and attempted to leave. They realized the victim's vehicle had blocked them in the driveway and saw the victim in the carport door frame with the keys to his vehicle in his hand. The victim said something about the keys and went back into his home. The petitioner went toward the house and confronted the victim at the doorway while Mitchell stayed outside. Gunshots went off, and the petitioner, with a gunshot wound to his side, exited the home with the keys to the victim's vehicle. The petitioner gave the keys to Mitchell, who moved the vehicle. Once the victim's vehicle was out of the way, the petitioner and Mitchell left. The petitioner told Dr. Woods that he had been drinking that night.

Dr. Woods reviewed the victim's medical records and observed that the victim had coagulopathy listed on his face sheet, which indicated that he "had a disease process in terms of [his] blood clotting properly." The victim's records also listed coagulopathy on the page which said diagnosis and operation, and his operating room records showed that the doctors cancelled the procedures due to coagulopathy. The victim's progress notes also mentioned coagulopathy. Dr. Woods explained that "coagulopathy is an inability of the blood to clot properly, and there are a number of reasons why one could have coagulopathy." Certain drugs, a lack of fibrinogen, a lack of Factor K, and alcohol, among other factors, can cause coagulopathy. Coagulopathy increases the amount of visible bruising when one is struck with an object. The Med Emergency Room/Trauma Physician Progress Notes contained in the victim's medical records showed that the victim tested positive for ethyl alcohol, which is alcohol for consumption, at .28%; however, the toxicology screen did not detect the presence of alcohol.

Dr. Woods reviewed the testing that Dr. Auble performed on the petitioner. Dr. Woods found it important that Dr. Auble performed a malingering test and stated that the overall pattern of the test showed that the petitioner had "stress and weakness . . . in the way that his brain functions. There are some parts of his brain that functioned reasonably well, there are other parts that don't function as well." Dr. Woods further observed that the petitioner clearly did not attempt to malinger on the test of a lingered memory, which is a forced choice test that requires the test taker to make an active choice. Dr. Woods noted that the petitioner's problems with executive functioning, the functions of the frontal lobe that allow one to weigh and deliberate, sequence behavior, and deductively reason, were lower and more defective

than someone who has an IQ of seventy-five. He stated that the petitioner's brain did not "work in very important problem solving ways. He has difficulty taking in information and using it in a way that works for him." Dr. Woods further stated that the petitioner's "frontal lobe, the part of the brain that really is designed to help him problem solve[,] is probably the worst functioning part of his brain." Dr. Woods testified that, in his opinion, the petitioner's problems in these areas are consistent with his behaviors.

Dr. Woods also reviewed Dr. Auble's conclusion and stated that he agreed with it, "particularly as it relates to the frontal lobes." Dr. Auble stated that the petitioner's performance on the Delis Kaplan test and the Categories tests, which "anyone with an intact frontal lobe should be able to do . . . very effectively," indicated that the petitioner had

> extraordinary difficulty problem solving and being able to figure out the circumstances that are going on and, in fact, his test style is an impulsive one, and that is to just kind of guess or to act rather than to have any . . . ongoing, even poor . . . methodology for solving his problems.
>
> He doesn't . . . process information well. He can't look at a circumstance and kind of put it together, even relatively simple circumstances.

In his supplement, Dr. Woods concluded that the petitioner "has some stress but that his specific weaknesses, particularly as it relates to his frontal lobe functioning, are really found in . . . the crime itself. But they are also found in other aspects of [the petitioner's] life, his real inability to weigh and deliberate." For example, Dr. Woods spoke about the letter to Mitchell that was handwritten by the petitioner and whereby the petitioner detailed aspects of the crime that only he or Mitchell could have known. Dr. Woods recalled that the petitioner denied that he wrote the letter for some time. Dr. Woods testified that although it may have been that the petitioner was simply denying the letter,

> when you look at the way [the petitioner's] brain works you really see that this kind of inability to weigh things properly, his kind of inability to . . . understand how these issues work, are absolutely consistent with the impairments in his brain whereas other aspects like his ability to read, for example, which would be . . . other parts of his brain, are reasonably intact.

Dr. Woods testified that, on the night of the crimes the petitioner going back inside the home with the victim inside after he and Mitchell had escaped was relevant regarding the petitioner's neurological functioning. He further testified that for the petitioner "to actually return into the house to go around the car, come back into the house after he had already left the house is, in [his] opinion, a real example of [the petitioner's] inability to . . . think through

49

what's the best thing to do in this situation." Dr. Woods said that the petitioner told him that he was confused during the events, and the petitioner did not offer a reason why he went back in the house, except that he wanted to get the keys to the victim's vehicle. Dr. Woods found it odd that the petitioner drove across town to get Mitchell to help him carry a television that was too heavy rather than burglarizing another house with a television that he could carry.

Upon questioning from the court regarding why the petitioner was different from any other person who makes a bad decision to commit a crime, Dr. Woods responded that

[i]n this particular situation [the petitioner] has specific cognitive deficits that impair his ability to weigh and deliberate. If someone has an intact brain where they can weigh and deliberate the neuro[]psychological testing doesn't really reflect these kinds of problems then . . . I totally agree with you because obviously people that commit crimes have bad judgment.

He said that the petitioner had more than bad judgment; he had an "inability to effectively weigh and deliberate, and if [the petitioner] did not have this neuro[]psychological deficit that speaks directly to that issue . . . [he] wouldn't have written that."

When asked about the significance of the petitioner and the victim firing guns at each other, Dr. Woods testified that the petitioner's telling Mitchell that he had to kill the victim because the victim had seen his face was significant because if the petitioner had not returned inside the home, the victim would not have seen his face. Dr. Woods also thought it was "interesting" that a single gunshot to the head killed the victim when there were several other gunshots fired and evidence of a beating of the victim. Dr. Woods said it was unclear why the petitioner hit the victim numerous times instead of shooting him again to kill him. He stated that the petitioner suffered deficits "in being able to weigh and deliberate, being able to sequence his behavior, [and] being able to size up a situation specifically."

The petitioner told Dr. Woods that he remembered very little about the burglary and killing of the victim. The petitioner did not deny being at the scene of the crime, having a gun, or shooting the gun. The petitioner said that he did not remember much of what happened because he was scared. Dr. Woods stated that the petitioner's going back into the home and shooting the victim, when he could have escaped or shot him from the driveway showed that the petitioner's quality of thinking was more consistent with the deficiencies in his brain functions than just the bad judgment of a criminal. The petitioner's traumatic stress affected his ability to remember what happened because "when a person becomes anxious the first thing [they] lose is . . . registration, "which is the ability to put memory in the brain. The petitioner's problems with his acute memory with registration would be the first to go under the circumstances of the crime. Dr. Woods testified that the petitioner drinking malt liquor,

50

which is fortified alcohol, could also affect his memory because it causes the metabolism to slow which increases the alcohol level in the body. Alcohol is "a direct toxic" to the brain and frontal lobes, and it impacts every part of the brain.

Dr. Woods testified that having an ongoing increased alcohol level also impacts one's ability to weigh and deliberate. He was familiar with Tennessee's statutory definition for premeditation and stated that, in his professional opinion, the petitioner did not kill the victim "after exercise of reflection in judgement." When asked whether the petitioner could form the intent to kill before the act, Dr. Woods stated that the petitioner could not form premeditation in his opinion. Dr. Woods denied that the petitioner was "sufficiently free from excitement and passion to be capable of premeditation" and said that there was "no question that this was an incredibly chaotic stressful situation." He further testified that "the idea that [the petitioner] would actually leave . . . the house and come back in and shoot [the victim] in [his] opinion really mitigates against there being premeditation, and . . . reflects the . . . heat of passion of the moment."

When asked by the court whether "in [his] professional opinion [he could] testify to a reasonable degree of psychological certainty that [the petitioner] was not . . . sufficiently free from passion or excitement to premeditate" though he was not present, Dr. Woods stated that he could not specifically say that, but what the petitioner told him and other information he received led him to that conclusion. Upon further questioning by the court, Dr. Woods said that although there was "no question in [his] professional opinion that there was both passion and excitement," he was "not sure whether [he] can take the next step and then say that [the petitioner] was incapable of premeditating." He was certain that the petitioner had both passion and excitement because the situation was extraordinarily chaotic. He based his opinion on the facts of the crimes and the psychology of the petitioner.

Dr. Woods reviewed Tennessee's statutory mitigating circumstances and testified that, in his opinion, the petitioner met the criteria for the mitigating circumstance that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." He said that comparing the petitioner with other criminals was difficult without knowing how the other criminals' minds work. He also said that the petitioner's brain function is such that his ability to weigh and deliberate is far below most criminals. Dr. Woods stated that because the petitioner had a known brain impairment and non-functional frontal lobe, he met the standard for committing the crime under the influence of extreme mental or emotional disturbance.

Dr. Woods testified that the petitioner also met the criteria for the mitigating circumstance that

the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime of which substantially affected the defendant's judgement.

He said that there was "no question" that the petitioner appreciated the wrongfulness of his conduct, and the petitioner's "inability to weight and deliberate" was unusually impaired in this case. According to Dr. Woods, the petitioner's impairment resulted from a mental disease and mental defect. The petitioner had difficulty processing information and problems with his communication quality and abstracting from mistakes. Dr. Woods explained that abstracting from mistakes means that the petitioner had trouble "pulling out the abstract quality which means this is wrong, this is something [he] shouldn't do again, this is a mistake." Moreover, the petitioner had problems learning from experience, logically reasoning, and controlling impulses because his brain does not effectively weigh and deliberate. Dr. Woods testified that at the time of the crimes, the petitioner had difficulty understanding the reactions of others, but if the petitioner were to look in retrospect he could understand what was going on at the time of the crimes.

Dr. Woods testified that although the petitioner's IQ of seventy-five was not legally within the range of mental retardation, statistically, under The American Association of Mental Retardation and the Diagnostic and Statistical Manual, the petitioner's IQ is within the range of mental retardation. He further testified that the petitioner's brain impairments were "even greater than what a 75 IQ could predict." He explained that an IQ score measured how much information one has about the world and is not a function of how well one's brain works. IQ testing is not neurological and someone with a high IQ score could still have brain impairments. He stated that the petitioner's IQ of 75 only told how much information the petitioner had about the world, but did not consider the petitioner's "very discreet neurological frontal impairments that impair his ability to deal in the world."

On cross-examination, Dr. Woods admitted that when he interviewed the petitioner, the petitioner did not reference the victim having a gun when he was discussing the victim's vehicle blocking them in the driveway and seeing the victim with the keys. He stated that the petitioner's first reference to the victim having a gun was when the petitioner told him that the victim shot him. Dr. Woods testified that the petitioner could recall the events that happened on the night of the burglary and could outline them.

Dr. Woods did not perform any additional tests on the petitioner and said that a doctor could have performed additional tests, such as an MRI. Dr. Woods believed that the petitioner had post traumatic stress disorder secondary to the Gaston Park shooting. Dr. Woods did not

make an Axis 1 psychological diagnosis because he saw the petitioner as having a neurological diagnosis.

The petitioner was the only person whom Dr. Woods interviewed, and Dr. Woods did not know whether the petitioner was intoxicated during the offenses. He agreed that the petitioner's father was away from the home because he worked all the time and that the petitioner's father had high standards for how he expected the petitioner and Mr. Gardner to do their chores. Although the petitioner's mother had seizures, no one indicated to Dr. Woods that the petitioner had ever had a seizure.

Dr. Woods agreed that the petitioner's behavioral problems started when the petitioner began hanging around really bad people; however, he said that his mother having seizures may have caused the petitioner's neurological problems. He stated that he did not know why the petitioner's frontal lobe did not develop correctly.

Charles Glover Fisher, a former Tennessee Corrections Institute employee, testified as an expert regarding the conditions of the Shelby County Jail. The Tennessee Corrections Institute inspected local jails, set standards for local jails, and trained jail employees. Mr. Fisher inspected the Shelby County Jail when it opened in 1982, performed the initial training for the jail, and performed subsequent inspections of it until he retired. He explained that Tennessee law required that the jail have an annual state inspection which covered the housing, kitchen, medical, and recreation areas; policies and procedures; and other aspects of the jail. At the time of this hearing, Mr. Fisher was familiar with the Shelby County Jail because he served as the court's expert in a case in 1997 and the court appointed him Special Master in that case in 2001. Mr. Fisher testified that due to his inspections, he was also familiar with the conditions of the Shelby County Jail from 1990 through 1992. During his inspections, Mr. Fisher interviewed jail personnel and inmates. Mr. Fisher visited the jail two to four times from 1990 to 1992.

In the late 1980s, Mr. Fisher recommended the Tennessee Corrections Institute place the Shelby County Jail on non-certified status, which meant that it did not meet Tennessee's standards. He made this recommendation because "the jail had moved to what they called a POD Boss System, which meant that an inmate in each of the [PODs] was officially designated by jail administration as the person who would run that POD." The person designated as the POD boss had control over the PODS and directed the activities and punishment of the inmates. The POD boss would select deputies or lieutenants to help in controlling the POD. The POD boss used physical force and threats of physical force to control the POD. There were homemade weapons in the jail, which were on display at one time. Mr. Fisher recalled that when Memphis began having a gang problem in the early to mid 90s, the jail switched from POD Boss to gang control.

53

Mr. Fisher testified that from 1990 through 1991, the POD boss had control over the phones at the jail and used the phones to discipline other inmates. During this time, the POD boss also had control over visitation, the bunks and where the inmates slept. The POD boss also controlled whether an inmate received food and the quantity of food an inmate received. Further, authorities allowed the POD boss to select an inmate to be his second in command, offer protection to the inmate who was second in command, and punish other inmates.

Beyond the POD Boss System, the jail's cleanliness, air quality, and infestations of mice and roaches were also issues. Mr. Fisher testified that in 1991 and 1992 the conditions in the jail were worse than when he recommended that the jail go on a non-certified status. He said that the jail had become overcrowded, the inmates had no personal space, and the correction officers lacked control. He further said that the inmates were "running their own jail, running their own POD." According to Mr. Fisher, the inmates made their own rules and punished inmates who did not follow the rules. The jail housed approximately 2,500 inmates during this time although it was structured for about half that number. Because inmates overcrowded the jail, triple bunks were in the day room although they constructed the jail for single bunks in each cell.

Co-counsel represented the petitioner in his death penalty trial along with trial counsel and was a member of the Shelby County Public Defender's Office's Capital Defense Team. She could not recall when she became involved in the petitioner's case or if she attended the first intake meeting, but she said that her attendance at the first intake meeting, which occurred shortly after the arrest, would have been the normal procedure. Co-counsel was the second chair in this case and normally the second chair attorney had minimal duties and the first chair did most of the case work. Co-counsel, trial counsel, the fact investigator, and the mitigation investigator formed the petitioner's defense team.

Co-counsel familiarized herself with the February 1989 edition of the *ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases*. She also believed that she consulted the *Tennessee Association of Criminal Defense Lawyers' Tools for the Ultimate Trial, Tennessee Death Penalty Defense Manual*. She did not remember either her or trial counsel seeking help or guidance from the Southern Center of Human Rights, Legal Defense Fund or similar organizations.

Co-counsel reviewed the mitigation evaluation done by the mitigation specialist and stated that it was the standard operating procedure for her office during the petitioner's case. The evaluation covered the client's background and historical information including family, employment, illnesses, childhood injuries, and any other information that would tell the defense team about the client and assist in the defense. Co-counsel stated that normally the

entire team is present during the mitigation interview although at times she may have had to finish information by herself.

Co-counsel reviewed the symptom checklist contained in the mitigation report and stated that the symptoms of dizziness, fainting spells, dropping objects, and the petitioner hesitating when he answered that he had no suicide attempts suggested possible mental illness or mental health problems. Co-counsel did not recall discussing obtaining a mental health expert with trial counsel or whether the defense called any mental health experts during the petitioner's trial. According to co-counsel, trial counsel made the decision whether to obtain a mental health expert.

In the public defender's office, directives of either the first or second chair dictated investigations. Co-counsel did not recall directing any investigation in this case, but stated that trial counsel may have included her thoughts in one of his directives. Co-counsel's name was not on any of the pretrial motions contained in the technical record from the original trial, and she said that trial counsel "did most, perhaps about ninety-eight to ninety-nine percent of the work filing the motions on this case." She further said that if trial counsel wrote letters in first person to the client, it would indicate that she did not assist trial counsel in writing those letters. Co-counsel testified that if she had consulted with trial counsel in writing the letter, then she "would not have necessarily signed off on it." Also, if the state responded to a motion, it did not give her a carbon copy of the response, but trial counsel gave her one.

Co-counsel could not personally recall anything about the petitioner's family. She also could not recall whether she contacted any of the petitioner's family members or dealt with them during the trial, but stated that the normal procedure was for trial counsel to be the primary contact person, and she was secondary. Co-counsel said that she had very little to do with the case and could not remember anything regarding when the petitioner was shot in 1990.

Co-counsel said that sometimes as second chair she conducted independent investigations herself, but in this case, trial counsel "basically handled the case himself." She explained that if trial counsel was comfortable with preparing the case himself, then she would have had little to do with the case, and her attention would be on other cases where she was the first chair. She did not remember how many other cases she was handling during the petitioner's trial, but was sure that it was a lot, especially if she had a limited role. She did not recall consulting with or seeking out any experts in the petitioner's case.

Co-counsel recalled Rule 12 of the Rules of the Supreme Court of the State of Tennessee, which requires the trial judge to complete a "Report in First-Degree Murder Cases" to assist the supreme court in a proportionality review. She could not remember

whether she participated in the completion of or received a copy of the Rule 12 report in the petitioner's case. Co-counsel reviewed the report, which was in the technical record, and observed where the trial judge marked "no" by all of the mitigating circumstances, except the section designated as "Other". Co-counsel could not recall whether she did any of the arguing at sentencing and did not know why the defense did not ask the court to charge that the murder was committed while the petitioner was under the influence of extreme mental or emotional disturbance as a mitigating circumstance. She likewise did not know whether the defense team considered charging that the petitioner's capacity "to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the [petitioner's] judgement'" as a mitigating circumstance.

Co-counsel testified that the petitioner's mother having seizures and the petitioner having birth problems were things that she would have considered in deciding whether they would be part of mitigation. She would also have considered the petitioner's early developmental delays and possibly the petitioner's father being absent from the home during the first five years of the petitioner's life as mitigation. She further stated that the petitioner's home life, any unfavorable comparisons between the petitioner and his brother, and the petitioner being picked on when he was younger due to his size were possible mitigating factors. She did not recall whether the defense had the petitioner's IQ tested before trial and said that she would have possibly considered the petitioner's IQ score of seventy-five as mitigation. Co-counsel said that she would have possibly considered the petitioner's family history of drug and alcohol use, the petitioner's use of alcohol and some drugs, suffering from post-traumatic stress disorder, traumatic experiences in the Shelby County Jail, and tendency to behave impulsively due to his low intelligence as mitigation.

On cross-examination, co-counsel testified that trial counsel was "primarily overwhelmingly" responsible for the decisions regarding the petitioner's defense; however, if trial counsel needed assistance, he would have asked her. She stated that had trial counsel felt that he needed a psychological examination of the petitioner, he would have discussed it with her or handled it himself.

The Assistant District Attorney General who prosecuted the petitioner's case testified for the state. He stated that he was the Division Leader in Shelby County Criminal Court Division VII, and he prosecuted the petitioner's case along with co-counsel. Mitchell was a witness as part of the state's proof in the petitioner's case. Before Mitchell testified, the prosecutor spoke with him regarding the circumstances of the case. Counsel represented Mitchell, and Mitchell's counsel informed the prosecutor that Mitchell did not wish to go to trial. Mitchell wanted to plead guilty and testify against the petitioner.

After Mitchell said he wanted to help the state with its case against the petitioner, the prosecutors, along with Mitchell's attorney, talked with the petitioner about Mitchell's knowledge of the case and presented Mitchell's potential testimony. The prosecutor never met with Mitchell without his attorney being present. The prosecutors in the petitioner's case never made an agreement with Mitchell or his attorney regarding the disposition of Mitchell's case. According to the prosecutor, they advised Mitchell and his counsel that they would make a recommendation regarding the disposition of Mitchell's case after he testified and after they consulted the victim's family members. After the petitioner's trial, the prosecutors met with the victim's family and came up with a recommendation with their consent. The prosecutors tendered an offer for Mitchell to plead guilty to especially aggravated robbery, among other charges, and receive a sentence of "thirty years on the case as an out of his range sentence," and Mitchell accepted the offer.

The prosecutor denied that he ever advised Mitchell to lie and stated that he advised Mitchell and his counsel that if Mitchell took that offer and said "something that in [the prosecutor's] estimation [was] not the truth that [they would] indict him for perjury." The prosecutor testified that, based on his conversations with Mitchell, Mitchell's statements to police, the police investigation, and the proof and facts as he knew them to be, he believed that Mitchell testified truthfully. The prosecutor stated that he told the victim's family that the prosecution believed that Mitchell testified truthfully and honestly, and the prosecution should not try him.

On cross-examination, the prosecutor testified that the prosecution could not seek the death penalty against Mitchell because he was a juvenile; however, the court could have sentenced him to life without parole. The prosecutor said that he could speak for himself and his co-counsel regarding there being no deals between the prosecution and Mitchell before trial because they both were present whenever they spoke with Mitchell and his counsel. He further explained that he was not privy to any telephone conversation between his co-counsel and Mitchell's counsel. However, in discussions with his co-counsel and Mitchell's counsel, there were no agreements made by the prosecution regarding the disposition of Mitchell's case. The prosecutor was unaware of any conversations between police officers and Mitchell about possible deals and did not believe such conversations took place.

The prosecutor denied that Mitchell's testimony was necessary to get a death sentence against the petitioner and stated that the prosecution "could have convicted [the petitioner] without Mitchell's testimony, and . . . the jury could have and [he believed] would have returned a death verdict against [the petitioner] without Mitchell's testimony." The prosecutor did not recall an interoffice memo in which he and his co-counsel wrote, "'We could not have gotten a death sentence against [the petitioner] without Mitchell's truthful cooperation[.]'"

57

The prosecutor reviewed the memo, and he admitted that it reflected that they needed Mitchell's testimony to secure a death sentence against the petitioner.

## Findings Of Post Conviction Court

On October 1, 2008, the post-conviction court entered an order denying relief. The post-conviction court found that the petitioner did not offer any proof to support the following issues, which were contained in the original petition for post-conviction relief: (1) the conviction was based on an "illegal confession" contained in the letter from the petitioner to Mitchell, which the state "illegally" introduced at trial and a violation of the petitioner's privilege against self-incrimination; and (2) the conviction was based on the state's failure to disclose exculpatory evidence to the petitioner.

Moreover, the post-conviction court found that the petitioner's arguments in the amended petition that counsel failed to: (1) establish a proper working relationship with the petitioner; (2) adequately prepare the petitioner's case; (3) be aware of the law applicable to the petitioner's case; (4) maintain an acceptable workload; (5) object to prejudicial, misleading, and/or false and inappropriate evidence at trial and did not adequately cross-examine the state's witnesses, particularly Mitchell; (6) complete the investigation necessary to represent the petitioner; (7) develop and pursue a comprehensive mitigation theory for the sentencing phase; (8) timely subpoena witnesses; (9) engage in the motion and jury instruction practices that were necessary to protect the petitioner's rights; (10) request necessary expert assistance; (11) file adequate pretrial discovery motions; (12) file adequate pretrial motions to preserve law enforcement's notes and a copy of the district attorney's file; (13) file adequate pretrial motions for assistance with the investigation, jury selection, forensic expert witnesses, forensic evidence testing, and mental health experts; (14) file adequate pretrial motions challenging the grand and petit jury selection process; (15) request a jury questionnaire; (16) file a motion to include jury information in the record; (17) file a proposed special verdict form; (18) present and adequately argue the motion to suppress the petitioner's statement to the police; (19) file pretrial motions seeking to limit the state's proof at the sentencing hearing to specific aggravating circumstances; (20) seek jury instruction that doubts regarding the appropriate sentence are to be resolved in favor of a life sentence; (21) file pretrial motions seeking the right to allocution; (22) cite United States and Tennessee Constitutions in their motion practice; (23) effectively voir dire jurors; (24) investigate evidence of the petitioner's diminished capacity; (25) investigate and present compelling mitigation in the petitioner's life history; (26) investigate the petitioner's prior offenses that were used as aggravating circumstances; (27) investigate the legitimacy of the petitioner's guilty pleas that were used to impeach his credibility at trial; (28) object to various jury instructions; (29) seek a limiting instruction regarding the state's introduction of evidence that was unrelated to any statutory aggravating circumstances; (30) make an offer of proof of the

58

petitioner's mother's testimony; (31) object to the state's closing argument that if the jury did not give the petitioner a death sentence he would kill someone close to the jurors; (32) object to the state's closing argument that the jury should focus on what is best for the community; (33) object to the state's closing argument that the jury should determine whether mitigating circumstances had been proven; (34) object to the state's closing argument that the last aggravating circumstance was that the petitioner knowingly committed the murder; (35) object to the state's closing argument that the jury could find the felony murder as an aggravating circumstance if it found that the murder occurred during a burglary or theft; (36) object to the state's closing argument that because the petitioner had no mercy on the victim, the jury should not have mercy on the petitioner; (37) object to the state's closing argument that the jury could not let sympathy play any part in its deliberations; (38) file an adequate motion for judgment of acquittal; (39) conduct post-trial juror interviews; (40) timely file the defense portion of the Rule 12 report; and (41) file a pretrial motion asserting the petitioner's rights under international law were either unsupported by proof or without merit. The post-conviction court also found that the petitioner's *Apprendi-Ring*, proportionality review, constitutional, and international law claims were without merit. Likewise, the court found that the petitioner's allegations regarding the disclosure of an agreement that Mitchell would receive a lesser sentence in exchange for his testimony, exclusion of the petitioner's testimony, counsel's failure to adequately raise various allegations previously discussed, sufficiency of evidence at trial, and flaws in the jury selection process were without merit. Finding that every allegation in the petition was without merit and that "the petitioner received a fair trial and sentencing hearing with an excellent team of experienced attorneys and investigators, properly prepared," the post-conviction court denied the petitioner's request for post-conviction relief.

## ANALYSIS

### I. Post-Conviction Standard of Review

Relief under the Post-Conviction Procedure Act of 1995, which governs the petition filed in this case, is only warranted when a petitioner establishes that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. In a post-conviction proceeding, the petitioner has the burden of proving allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State,* 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace*

*v. State,* 121 S.W.3d 652, 656 (Tenn. 2003); *Nichols v. State,* 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns,* 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not re-weigh or re-evaluate the evidence or substitute its inferences for those drawn by the post-conviction court. *Nichols,* 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id.* (citing *Henley v. State,* 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. *Wallace,* 121 S.W.3d at 656; *Nichols,* 90 S.W.3d at 586. As such, our review is *de novo,* and we accord the conclusions reached below no presumption of correctness. *Id.*

## II. Ineffective Assistance of Counsel
## A. Standard of Review

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [defense]." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment.'" *Gideon v. Wainwright*, 372 U.S. 335, 340 (1963) (quoting *Betts v. Brady,* 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970); *see also Strickland v. Washington*, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686; *Combs v. Coyle,* 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs the court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687; *see also Combs,* 205 F.3d at 277.

The performance prong of the *Strickland* test requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of

reasonableness, or "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690; *see also Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs,* 205 F.3d at 278 (quoting *Strickland*, 466 U.S. at 689). Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State,* 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp,* 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665, n.38 (1984)). Notwithstanding, we recognize that "our duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." *Id.* at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland,* 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. *Nichols,* 90 S.W.3d at 587. That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. *Nealy v. Cabana,* 764 F.2d 1173, 1178-1179 (5th Cir. 1985); *Code v. Montgomery,* 799 F.2d 1481, 1483 (11th Cir. 1986). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland.*" *State v. Zimmerman,* 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); *see also Chambers v. Armontrout,* 907 F.2d 825, 832 (8th Cir. 1990). Moreover, when challenging a death sentence, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have

concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Henley,* 960 S.W.2d at 579-580 (citing *Strickland,* 466 U.S. at 695).

The petitioner argues on appeal that the post-conviction court erred in denying his post-conviction claims that defense counsel provided ineffective assistance. Specifically, the petitioner argues that his attorneys breached objective standards of reasonableness for capital representation, thereby causing prejudice to the outcome of his case, by: (1) failing to secure the services of any psychological experts to examine the petitioner and perform the neurological testing necessary to uncover substantial evidence that could have been used both during the guilt phase to negate the specific intent required for first degree premeditated murder and during the penalty phase as mitigation; (2) failing to object to improper closing arguments by the prosecutor during the penalty phase; (3) eliciting testimony from mitigation witnesses during the penalty phase that opened the door to the state's introduction of the petitioner's prior convictions for theft and burglary; (4) failing to object to that portion of the prosecutor's penalty phase closing argument in which he encouraged the jury to consider the theft and burglary convictions in deciding whether to sentence the petitioner to death; (5) failing to request a limiting instruction as to how the theft and burglary convictions should have been considered by the jury; (6) failing to make an offer of proof in order to preserve for appellate review the trial court's error in excluding "lack of remorse" testimony from the petitioner's mother during the penalty phase; (7) failing to object to the prosecutor's argument that the petitioner deserved a death sentence because he had shown no remorse; (8) failing to investigate and present evidence to rebut the medical examiner's testimony used to support the heinous, atrocious, or cruel aggravating circumstance; (9) failing to investigate and present as mitigation during the penalty phase evidence related to the petitioner's prior incarceration in the Shelby County penal system; (10) failing to investigate and present all available mitigation witnesses; (11) failing to properly prepare those individuals who did testify as mitigation witnesses; (12) failing to challenge the jury instruction given on the heinous, atrocious, or cruel aggravating circumstance; and (13) failing to raise or adequately raise certain issues on appeal from the petitioner's convictions and resulting sentences. An analysis of each of these arguments[4] demonstrates no basis for reversal of the post-conviction court's denial of relief.

**1. Failure to secure the services of any psychological experts and perform neurological testing**

The petitioner argues that despite numerous red flags that should have prompted a

---

[4] Our analysis of some issues may be repetitive because we have addressed each of the petitioner's issues, although some were duplicated, to ensure a complete and thorough review of this capital case.

neuropsychological evaluation, trial counsel failed to secure a psychological expert to examine the petitioner and perform the necessary neurological testing or a mental health evaluation to uncover substantial evidence that could have been used during the guilt phase to negate the specific intent required for first degree premeditated murder and during the penalty phase as mitigation. The petitioner asserts that the mitigation investigator's report, which indicated that the petitioner had suffered from dizziness, fainting spells, and dropping objects, should have alerted the defense team of the need for a neuropsychological evaluation. He also asserts that his history of head trauma, complications at birth, and his mother's history of seizures were also red flags which should have triggered a neuropsychological evaluation. The petitioner likewise points to his early adolescent drug and alcohol abuse, academic failures, repetition of grades, and his persistent failure to understand and process information, engage in logical reasoning, and communicate effectively with his attorney as red flags which should have prompted trial counsel to request a neuropsychological evaluation. He contends that counsel's failure to obtain such experts to examine the petitioner was "in contravention of the well-defined norms of capital defense practice." The petitioner alleges, based on the testimony of Dr. Auble and Dr. Woods, that due to counsel's failure to request mental health experts and a neuropsychological examination, he suffered the prejudice of the jury neither hearing that he had brain damage which hindered his executive decision-making functioning nor how his mental impairments caused him to act impulsively in high stress situations. Furthermore, he argues that the failure to obtain a mental health expert or neuropsychological examination prejudiced him by not having the following mitigating circumstances presented to the jury:

> (2) [t]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; [and]
>
> . . . .
>
> (8) [t]he capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment[.]

Tenn. Code Ann. § 39-13-204(j)(2), (8).

Counsel does not have a constitutional duty to offer mitigation evidence at the penalty phase of a capital trial; however, the basic concerns of trial counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the state and to present mitigating evidence on behalf of the defendant. Although there is no

requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. *See Goad v. State,* 938 S.W.2d 363, 369-70 (Tenn. 1996).

Trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense; however, trial counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland,* 466 U.S. at 691. In determining whether counsel breached this duty, this court reviews counsel's performance for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's prospective at the time. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citations omitted). There is no requirement that counsel investigate every conceivable line of mitigating evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. *Id.* at 533. Likewise, counsel is not required to interview every conceivable witness. *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir. 1995). Counsel's duty to investigate and prepare is not limitless. *See Washington v. Watkins,* 655 F.2d 1346 (5th Cir. 1981). We will not find counsel's performance deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. *See Babbitt v. Calderon,* 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). To summarize,

> no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reviewing court must consider several factors when determining whether trial counsel was ineffective for failing to present mitigating evidence:

> 1. The nature and extent of the mitigating evidence that was available but not presented by trial counsel. *Goad,* 938 S.W.2d at 371 (citing *Deutscher v. Whitley*, 946 F.2d 1443 (9th Cir. 1991); *Stephens v. Kemp,* 846 F.2d 642 (11th Cir. 1988); *Cooper v. State,* 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992); *Adkins v. State,* 911 S.W.2d 334 (Tenn. Crim. App. 1994)).
> 2. Whether trial counsel presented substantially similar mitigating evidence to the jury in either the guilt or penalty phase of the proceedings. *Id.* (citing *Atkins v. Singletary,* 965 F.2d 952 (11th Cir. 1992); *Clozza v. Murray,* 913 F.2d 1092 (4th Cir. 1990); *State*

*v. Melso*n, 772 S.W.2d 417, 421 (Tenn. 1989)).
3. Whether the evidence of applicable aggravating factor(s) was so strong that the mitigating evidence would not have affected the jury's determination. *Id.* (citing *Fitzgerald v. Thompson,* 943 F.2d 463, 470 (4th Cir. 1991); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987)).

The petitioner's arguments regarding trial counsel's failure to request a neuropsychological evaluation to secure evidence for the guilt phase are intertwined with his complaints that counsel failed to present sufficient mitigating evidence, and they cannot be entirely separated. We will, therefore, address the issues regarding the petitioner's allegations of deficient investigation into a neuropsychological evaluation together.

During the guilt phase, the defense team attempted to establish reasonable doubt in the juror's minds and show that the homicide was not closely related to the underlying felony so as to undercut the state's felony murder case. The defense felt that the homicide was "more felony murder than it was premeditated first degree murder." During the penalty phase of the petitioner's trial, the petitioner presented the testimony of his mother, father, brother, and aunts. The petitioner's family testified that the petitioner was a good child who had a close relationship with his family and never got into trouble until his teens. The defense strategy during this phase was to generate sympathy for the petitioner and show that he was not a bad person and had a family who cared about him. The defense team did not present any evidence concerning the petitioner's brain impairments or mental deficiencies at either phase of the trial.

Regarding trial counsel's failure to uncover substantial evidence that the defense could have used to negate the specific intent required for first degree premeditated murder, the post-conviction court found that the testimony of Dr. Auble and Dr. Woods was "mere supposition and conjecture, and [was] hardly compelling." The court further found that after speaking with the petitioner and his family and reviewing the petitioner's school records, the defense team did not find a particularized need for funds to hire such experts. In addition, the post-conviction court found that the court would not have allowed Dr. Woods's testimony that the petitioner had a "diminished capacity" to premeditate a murder during the guilt phase of the trial because diminished capacity is not a defense which Tennessee courts recognize. Likewise, in its order denying relief, the post-conviction court found that the mitigation evidence offered by Dr. Auble and Dr. Woods was "highly speculative and circular in its reasoning[,] would not be received well by a jury[,] and would be readily susceptible to ridicule by the State in its closing arguments." The post-conviction court further stated that the defense team "put on as compelling a case for mitigation as it could, given the hard facts, and put on all the evidence they felt would not open the door to proof by the state that would compromise their theory of mitigation." The court found that the petitioner had never been

diagnosed with a mental illness, there was no hard evidence to support the petitioner's diagnosis of frontal lobe damage, the petitioner did not have trouble in school until he began drinking excessively and committing crimes, and the petitioner did not have a traumatic or deprived childhood.

To prevail on a claim of trial counsel's ineffectiveness, both substandard performance and prejudice caused by the performance must be shown. *Strickland,* 466 U.S. at 668. To meet the *Strickland* test, a defendant has the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the complained about conduct was not the result of a strategic decision. *Id.* at 688-689. A defendant must demonstrate "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 694.

The petitioner argues that several red flags should have compelled trial counsel to request a neuropsychological evaluation to secure evidence. Trial counsel testified that neither the petitioner, his family, nor anyone else ever indicated that the petitioner had any type of emotional or psychological problems or mental illness, disease, or defect. In fact, trial counsel testified that the petitioner's parents emphatically asserted to trial counsel that the petitioner "was not crazy." Counsel stated that, in his practice, he routinely encountered individuals with mental problems that necessitated follow-up investigation, and if anything in the petitioner's case had suggested the need for further evaluation, he would have followed up and done further investigation. We disagree that the red flags listed by the petitioner necessarily triggered the need for a neuropsychological evaluation and do not find that trial counsel was deficient for not requesting one.

Even if we were to conclude that trial counsel was deficient in failing to order a neuropsychological evaluation, the petitioner has failed to show that he was prejudiced. Regarding prejudice, the question before us is whether it is reasonably probable that the outcome would have been different had counsel presented the mitigating evidence presented at the evidentiary hearing at trial. We conclude that it would not have been different. The mitigating evidence obtained from the neuropsychological evaluation was merely speculative, as the post-conviction court found. It did not show that the petitioner committed the murder under the influence of extreme mental or emotional disturbance or that the petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect, which was insufficient to establish a defense to the crime but which substantially affected the petitioner's judgment. The petitioner has not met the standard of proving ineffective assistance of counsel and is not entitled to relief on this issue.

**2. Failure to object to improper closing arguments by the prosecutor during the penalty**

66

**phase**

The petitioner contends that defense counsel was deficient for failing to object to certain portions of the prosecutor's closing arguments. The petitioner alleges that the prosecution arguments "encouraging the jury to consider the needs of the community, future dangerousness of the [petitioner], specific deterrence, desire for vengeance, and impact on the victim" were improper and defense counsel failed to object to them. The petitioner also claims that defense counsel likewise failed to object to the prosecutor's improper arguments which constructed a burden of proof for mitigating factors and invoked the Christian tenet to diminish the jury's responsibility. He argues that defense counsel's failure to object was deficient, and this deficiency prejudiced him because the prosecutor's arguments "affected at least one juror's sentencing determination."

This court has considered whether trial counsel's failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel. *See Gregory Paul Lance v. State*, No. M2005-01765-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App., Nashville, Aug. 16, 2006), *perm. to appeal denied* (Tenn. Dec. 18, 2006). In *Lance*, this court held that:

> [b]ecause the reviewing court must indulge a strong presumption that the conduct falls within the range of reasonable professional assistance and may not second-guess the tactical and strategic choices made by counsel unless those choices were uninformed because of inadequate preparation, it is highly unlikely that [the petitioner will succeed] in meeting either the deficiency or the prejudice prong of the ineffective assistance of counsel claim based on trial counsel's failure to object to the improper closing argument.

*Id*. at *6 (citations omitted); *see Strickland,* 466 U.S. at 690; *Hellard,* 629 S.W.2d at 9. We approach the present case under the same legal framework. The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions. As noted by the *Lance* court, attorneys may often choose not to object to damaging evidence for strategic reasons, such as "to avoid emphasizing [the unfavorable evidence] to the jury." *Lance,* 2006 WL 2380619, at *6.

When a prosecutor has engaged in improper conduct, the test for determining whether there is reversible error is "whether the impropriety 'affected the verdict to the prejudice of the defendant.'" *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994) (quoting *Harrington v. State,* 385 S.W.2d 758, 759 (1965)). In making this determination, the court considers: (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the

prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *Id.* (citing *State v. Buck,* 670 S.W.2d 600, 609 (Tenn. 1984); *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The petitioner first claims that defense counsel failed to object when the prosecution, in its closing argument, stated, "I'm going to ask you to shift the focus now and focus on what is best for the people of Shelby County, Tennessee. What is best for the people in our community, where we live, where we work, what is best for us." The post-conviction court found that this argument did "improperly suggest that the jury should focus on community needs rather than on aggravating and mitigating factors and the individualized sentencing of the [petitioner]"; however, the court did not find that this improper argument "caused prejudice to the [petitioner] which affected the verdict in this case." The post-conviction court found that the conduct complained of was innocuous in light of the facts and circumstances of the case, the court did not undertake curative measures because trial counsel did not object, the intent of the prosecutor was to shift the jury's focus from the presumption of a verdict in favor of the petitioner, there was no significant cumulative effect from the improper conduct, and the state had a significantly strong case. Additionally, the post-conviction court noted that the prosecutor never returned to this argument or suggested that sentencing the petitioner to death was best for the community. We agree with the post-conviction courts findings and conclude that the petitioner has not shown that counsel's failure to object to this argument prejudiced him.

The petitioner also argues that the prosecutor's argument which urged the jury to look beyond the mitigating factors and aggravating circumstances and consider what the community would be like if the petitioner were still a member was improper. The petitioner complains that the prosecutor improperly characterized the petitioner as one who terrorized the community and referred to him as "a great big King Kong." He further complains that the prosecutor argued that a death sentence was the only way to deter the petitioner "from taking away another valued member of the community." The post-conviction court found that the Tennessee Supreme Court had already decided the issue against the petitioner. *See Sims,* 45 S.W.3d at 15-16 (holding that the comment was an attempt to improperly sway the jury, but it was brief and isolated, and the petitioner was not prejudiced). The supreme court agreed with this court's decision on direct appeal that "these limited comments by the prosecutor did not affect the jury's sentencing decision in light of the facts and circumstances of this case." *Id.* at 16. Moreover, the post-conviction court further found that because trial counsel turned this argument against the state, it would not have affected the jury's verdict. We agree with the post-conviction court's findings and conclude that the petitioner was not prejudiced and therefore, is not entitled to relief on this issue.

Next, the petitioner argues that the prosecutor made improper attempts to "sway the jury into considering irrelevant, non-statutory aggravating circumstances by encouraging the jury to make a retaliatory sentencing decision." The petitioner contends that the prosecutor's statements, which reminded the jury that the petitioner did not show any mercy toward the victim and encouraged the jury to give the petitioner the same consideration which the petitioner had given the victim, were attempts "to persuade the jury to make a retaliatory sentencing decision rather than a reasoned moral response to the evidence." The petitioner claims that his case is analogous to *Bigbee,* 885 S.W.2d at 812, in which the state supreme court held that "the prosecutor strayed beyond the bounds of acceptable argument by making a thinly veiled appeal to vengeance, reminding the jury that there had been no one there to ask for mercy for the victims." The post-conviction court distinguished the petitioner's case from *Bigbee* and found that it was more analogous to *State v. Stephenson,* 195 S.W.3d 574, 602 (Tenn. 2006) (holding that the prosecutor's arguments which "urged the jury not to be swayed by sympathy or emotion in response to the pleas of the defendant's family for a sentence other than death" were not improper).

We agree with the post-conviction court's findings that this case is more analogous to *Stephenson*. In *Bigbee*, the prosecutors's remarks urged the jury to punish the defendant for killings in another county for which he had already been punished. In this case, as well as in *Stephenson*, the prosecutor's arguments urged the jury not to let sympathy or prejudice affect its decision. We conclude that these comments were not improper, and the petitioner suffered no prejudice and is therefore not entitled to relief on this issue.

The petitioner further argues that trial counsel's failure to object to the prosecutor's improper arguments constructing a burden of proof for mitigating factors constituted deficient performance. The petitioner claims that the prosecutor's argument that the jury was to consider whether the defense had proven mitigating factors was improper because "the law does not impose a burden of proof regrading mitigating factors," and the jury was to consider any mitigating factors "merely 'raised by the evidence.'" Regarding the prosecution stating that the jury had "to determine whether the mitigating circumstances [had] been proven," the post-conviction court found that because the trial judge instructed the jurors that they "shall consider. . . any mitigating circumstances raised by the evidence . . . [and] [t]he [petitioner] does not have the burden of proving a mitigating circumstance," the prosecutor's change in wording was a harmless error which created no prejudice to the petitioner. The evidence does not preponderate against the post-conviction court's finding that the error was harmless. Although the prosecutor should have stated that the jury must determine whether the mitigating circumstances had been raised by the evidence rather than proven, the trial judge's instructions to the jury fairly informed the jury of the legal issues and applicable law regarding mitigating circumstances. These instructions clarified the prosecution's error in using the term "proven" instead of "raised." Accordingly, we conclude that any error was

harmless and did not affect the verdict to the prejudice of the petitioner. Thus, the petitioner is not entitled to relief on this issue.

Finally, the petitioner argues that counsel was ineffective for failing to object to the prosecution's invocation of the Christian tenet during closing arguments which diminished the jury's responsibility. The petitioner further claims that the prosecutor's arguments that the ability to forgive the petitioner laid only with the victim, suggested that the victim, and not the jury, had the responsibility of deciding whether the petitioner should be sentenced to life in prison. The petitioner states that this argument gave the impression that "if the jury believed that [the petitioner] had sinned against the victim, then their only choice was to sentence him to death" because the victim was "the only person who could possibly decide whether [the petitioner] should instead spend the rest of his life in prison." We note that the petitioner raises the issue of the prosecution invoking the Christian tenet for the first time on appeal. Generally, an appellate court will not allow a party to raise an issue for the first time on appeal because such action denies the adversary opportunity to rebut the issue with evidence and argument. *See Walsh v. State,* 166 S.W.3d 641, 645 (Tenn. 2005) ("Issues not addressed in the post-conviction court will generally not be addressed on appeal."); *State v. Adkisson,* 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994) ("[A] party will not be permitted to assert an issue for the first time in the appellate court."); *see also* Tenn. Code Ann. § 40-30-110(f) ("There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived."). Furthermore, a petitioner may not change theories between the lower court and the appellate court. *State v. Alder,* 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). The petitioner failed to present these claims before the post-conviction court, which is a court of competent jurisdiction. Accordingly, the petitioner has waived this issue.

**3. Elicitation of testimony from mitigation witnesses during the penalty phase that opened the door to the state's introduction of the petitioner's prior convictions for theft and burglary**

The petitioner contends that trial counsel was deficient for opening "the door to the [s]tate's introduction of [the petitioner's] prior convictions for theft and burglary that the jury would not have otherwise heard." Further, the petitioner argues that trial counsel should have filed a pretrial motion to restrict the state's use of the petitioner's prior convictions, objected to the state's use of the prior convictions, and requested a limiting jury instruction regarding the state's use of the prior convictions. The petitioner goes on to argue that "[c]ounsel also demonstrated their lack of preparation for this issue by not speaking to mitigation witnesses before calling them to testify."

**a. Waiver**

70

The state contends that the petitioner has waived the specific issues of trial counsel opening the door for the state to introduce the petitioner's prior convictions for theft and burglary and trial counsel failing to prepare witnesses to testify at the sentencing hearing by raising them for the first time on appeal. After reviewing the record, we agree with the state that the petitioner has raised the issue of trial counsel opening the door for the state to present evidence of the petitioner's prior convictions for violent offenses for the first time on appeal and, thus, has waived the issue. As stated above, we will not allow a party to raise an issue for the first time on appeal because such action denies the adversary opportunity to rebut the issue with evidence and argument. *See Walsh,* 166 S.W.3d at 645; *Adkisson,* 899 S.W.2d at 635. However, because the petitioner presented testimony, albeit scarce, regarding trial counsel's failure to interview mitigation witnesses, we cannot agree that the petitioner has waived the issue of trial counsel's failure to prepare mitigation witnesses.

**b. Failure to file pretrial motion to restrict the state's use of the petitioner's prior convictions and failure to object to the state's use of the petitioner's prior convictions**

We first address whether trial counsel was ineffective for failing to file a pretrial motion asking the court to restrict the state's use of non-statutory aggravating circumstances such as the petitioner's prior convictions and failing to object to the state's use of the prior convictions during its closing argument. The post-conviction court found that a pretrial motion to limit the state's proof during sentencing to statutory aggravating circumstances would not have affected the aggravating circumstances that the state presented. The court found that because the jury could properly consider whether the state had proven one or more of the aggravated circumstances beyond a reasonable doubt and the unlisted non-violent felonies were relevant to rebut mitigation, trial counsel's failure to file pretrial motions to restrict the use of non-statutory aggravating circumstances and a limiting jury instruction did not prejudice the petitioner. On appeal in this case, our supreme court held that the petitioner's prior convictions were "relevant to rebut the mitigating testimony that [the petitioner] was not an aggressive person." *Sims,* 45 S.W.3d at 14. In his own brief, the petitioner concedes that a motion to restrict the state's use of non-statutory aggravating circumstances "may have had little effect on the [s]tate's action at trial." Considering all of this, we conclude that the petitioner has failed to show that he was prejudiced by trial counsel's failure to file a pretrial motion asking the court to restrict the state's use of non-statutory aggravating circumstances such as the petitioner's prior convictions. Accordingly, the petitioner is not entitled to relief on this issue.

**c. Failure to request a limiting jury instruction**

Regarding trial counsel's failure to request a limiting jury instruction, the petitioner

argues that trial counsel should have requested a limiting instruction regarding the petitioner's prior convictions. In support of his position, the petitioner cites the supreme court's decision in this case which states that a

> limiting instruction in this case would have informed the jury that the prior convictions could be considered solely for the purpose of rebutting the mitigating testimony related to [the petitioner]'s character as a non-aggressive person. Such an instruction would have decreased the danger of inserting a non-statutory aggravating circumstance into the jury's deliberations.

*Sims,* 45 S.W.3d at 15. However, we have reviewed the transcript of the post-conviction hearing, and the petitioner has failed to present any proof as to how this alleged deficiency on the part of counsel might have altered the outcome of his trial. His allegations of prejudice are pure speculation. The petitioner is not entitled to post-conviction relief on the basis of this issue.

### d. Failure to prepare witnesses

The petitioner asserts that trial counsel was deficient for failing to speak with Trezevant Gardner, Mary Gardner, and Naomi Gardner before they testified. The petitioner alleges that trial counsel's failure to prepare these witnesses demonstrated the defense team's lack of preparation for the issue of the admissibility of the petitioner's prior convictions. Trial counsel testified that he did not remember contacting Trezevant Gardner, Mary Gardner, or Naomi Gardner prior to their testimony. The witnesses testified that trial counsel did not contact them to discuss their testimony before they testified. The post-conviction court found that these witnesses' testimony either did not add to the mitigation which trial counsel presented or added "information contradicting other mitigation testimony or introduc[ed] prejudicial, damaging evidence." We agree with the finding of the post-conviction court and add that the petitioner has failed to show how additional witness preparation would have affected the outcome of his case. The witnesses testified that trial counsel did not prepare them to testify; however, they offered no evidence whatsoever regarding how preparation would have altered or improved their testimony. Accordingly, we conclude that the petitioner has failed to show prejudice and, therefore, is not entitled to relief on the issue.

### 4. Failure to make an offer of proof in order to preserve for appellate review the trial court's error in excluding "lack of remorse" testimony from the petitioner's mother during the penalty phase

The petitioner next contends that trial counsel was ineffective for failing to preserve

72

for appellate review the trial court's exclusion of evidence regarding the petitioner's lack of remorse. Trial counsel attempted to introduce evidence of the petitioner's remorse during the sentencing hearing by asking the petitioner's mother if he expressed remorse. The state timely objected on the basis of hearsay, and the trial court sustained the state's objection. Trial counsel did not make an offer of proof or raise the issue in his motion for new trial, thereby waiving the issue for appellate review. The post-conviction court found that

> if the witness's answer would have tended to be mitigating, trial counsel should have responded to this erroneous ruling of the trial judge to remind him that hearsay is allowed in a capital sentencing hearing, and ask to be allowed to make an offer of proof outside the presence of the jury so as not to waive this issue. However, as post-conviction counsel has also not made an offer of proof at the hearings on this petition as to the response of the witness, this allegation must fail for lack of a showing of prejudice to the petitioner.

The post-conviction court further found that because the testimony would have come from the petitioner's mother rather than the petitioner himself, the jury would have given it little weight. The evidence does not preponderate against the post-conviction court's findings; thus, we conclude that the petitioner is not entitled to relief on this issue.

**5. Failure to object to the prosecutor's argument that the petitioner deserved a death sentence because he had not shown remorse**

The petitioner contends that trial counsel was deficient for not objecting to the prosecutor's statements during closing arguments that the petitioner showed no remorse. The petitioner posits that the prosecutor's statement regarding the petitioner's lack of remorse "improperly encouraged the jury to look beyond the scope of the evidence and consider the non-statutory aggravating circumstance of 'no remorse.'" The state argues that the petitioner has raised the issue for the first time on appeal and has consequently waived the issue for our review. After reviewing the record, we agree with the state that the petitioner has raised the issue of trial counsel not objecting to the state's argument regarding the petitioner's lack of remorse for the first time on appeal. Thus, the petitioner has waived the issue and is not entitled to relief. *See Adkisson,* 899 S.W.2d at 635.

**6. Failure to investigate and present evidence to rebut the medical examiner's testimony used to support the heinous, atrocious, or cruel aggravating circumstance**

The petitioner argues that trial counsel did not fully investigate evidence to rebut the testimony used by the state to support the application of the heinous, atrocious, or cruel aggravating circumstance. The state claims that the petitioner waived this issue by presenting

it for the first time on appeal; however, Dr. Woods's testimony raised this issue during the post-conviction hearing, and we will address it. The jury found that the aggravating circumstance that "the murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death" was applicable to the petitioner's case. *See* Tenn. Code Ann. § 39-13-204 (i) (5). According to the petitioner, if trial counsel had conducted a full investigation and obtained the victim's medical records, they would have "discovered that the admitting physician's records showed that the victim had coagulopathy due to an alcohol content in his blood of .28 percent," which would significantly increase bleeding and bruising. The petitioner asserts that this increased bleeding and bruising made the photographs of the vicitm's body "appear worse than they would have been otherwise and enhanc[ed] the repeated references to bruising in the testimony of the medical examiner." The petitioner further asserts that the jury did not hear any expert testimony regarding how his cognitive impairments made him likely to engage in "impulsive and preservative actions," which would "come under the heading of 'loss of control' resulting in preservative actions" which justified the heinous, atrocious, or cruel aggravating circumstance.

The post-conviction court made no factual findings regarding counsel's failure to investigate and present evidence to rebut the evidence used to support the heinous, atrocious, or cruel aggravating circumstance. However, our review of the record reveals that the jury found the following aggravating circumstances: (1) the petitioner was previously convicted of one or more felonies involving the use of violence against a person; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing the arrest or prosecution of the petitioner; and (4) the murder was committed during the commission of a burglary or theft. *See* Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7). Even if counsel did eliminate one of the state's noticed aggravating sentencing factors, it would not have removed the threat that the petitioner could receive the death penalty because there were three other aggravating factors presented. Therefore, the petitioner's attack on counsel's effectiveness based on failing to challenge the "especially heinous, atrocious, or cruel" death penalty aggravating factor is without merit as the petitioner has not shown prejudice.

**7. Failure to investigate and present as mitigation during the penalty phase evidence related to the petitioner's prior incarceration in the Shelby County penal system**

Next, the petitioner argues that counsel were ineffective for failing to investigate the petitioner's prior incarceration in the Shelby County penal system. The petitioner claims that had counsel investigated the petitioner's prior incarceration, "they would have discovered critical information concerning the hellish conditions there and how those conditions drove [the petitioner] to be mentored and unduly influenced by Sammie Netters, a professional

criminal." The petitioner alleges that counsel could have used the information regarding the petitioner's prior incarceration and relationship with Mr. Netters during mitigation to help explain why the petitioner committed the crimes. The post-conviction court found that "[a]lthough there was much proof put on about the horrible conditions in the jail where [the petitioner] was housed, there was no direct link made to its effect on the petitioner or its contribution to the murder." The court went on to state that it was unfortunate that the petitioner chose Mr. Netters to be his mentor and role model; however, it was significant that the petitioner led the burglary of the victim's home and did not commit the crimes under anyone else's influence. The post-conviction court ultimately found that the petitioner did not show prejudice because none of the additional mitigation submitted by the petitioner at the post-conviction hearing "would tend to lessen the culpability of the petitioner," help the petitioner, or show that a sentence other than death was more appropriate. The evidence does not preponderate against the findings of the post-conviction court. Although there was ample testimony regarding the conditions in the Shelby County penal system while the petitioner was incarcerated and regarding the petitioner's relationship with Mr. Netters, there was no evidence which showed how either would have affected the outcome of the trial and sentence. Accordingly, we conclude the petitioner has failed to meet the burden of proving that there is a reasonably probability that, but for counsel's deficiency in failing to investigate the petitioner's prior incarceration in the Shelby County penal system, the results of the proceedings would have been different. The petitioner is without relief on this issue.

**8. Failure to investigate and present all available mitigation witnesses and properly prepare those individuals who did testify as mitigation witnesses**

For his next issue, the petitioner alleges that trial counsel failed to investigate and present all available mitigation witnesses and that counsel did not adequately prepare those mitigation witnesses who did testify. The petitioner cites *Wiggins v. Smith* to support his claim that counsel's failure to investigate and present all available mitigation witnesses and failure to prepare the witnesses who did testify amounted to deficient performance. *See Wiggins v. Smith,* 539 U.S. 510, 524-25 (2003) (holding that counsel were ineffective for "abandon[ing] their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources").

In *Wiggins*, the evidence during the post-conviction hearing revealed that Wiggins suffered

> severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities,

further augment his mitigation case.

*Id.* at 535. The Court held that Wiggins had "the kind of troubled history [they] have declared relevant to assessing a defendant's moral culpability." *Id.* (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). The state contends that this case is distinguishable from *Wiggins* because the evidence presented at the post-conviction hearing established that "if anything, [the petitioner] had a relatively stable, albeit imperfect, family environment" and fell "short of the quantum of evidence required by *Wiggins*." The state claims that *Carter v. Mitchell,* 443 F.3d 517, 531 (6th Cir. 2006), where the Sixth Circuit found no prejudice when the mitigating evidence showed that the petitioner had a "relatively stable, although imperfect, family environment . . . [with] no allegations of physical or sexual abuse," is more applicable to this case.

At the post-conviction hearing, the petitioner presented the testimony of Naomi Gardner, Mary Gardner, and Trezevant Gardner, who testified at the petitioner's trial. The petitioner also presented the testimony of Mr. Wilson, Ms. Baptist, Mr. Netters, Dr. Woods, and Dr. Auble, none of whom testified at the petitioner's trial. The petitioner did not call any other witnesses to testify regarding additional information that counsel may have discovered upon further investigation or during pretrial interviews. The post-conviction court found that the testimony of the witnesses that the petitioner called during his post-conviction hearing to show additional mitigation either did not add to the mitigation presented, added information which contradicted the other mitigation testimony, or introduced prejudicial evidence. The court further found that the evidence presented by post-conviction counsel showed that

> [u]nfortunately for the defense, the petitioner didn't lead a traumatic or deprived childhood. Unlike the vast majority of the defendants which qualify for the sentence of death, the petitioner's father married his mother, the petitioner grew up in a two-parent household with additionally three loving aunts on whom he could depend.

The court found that although counsel did not present the additional mitigation during the trial, "it would not have helped the petitioner, and some of it, necessitating the revelation [of] bad traits and acts of the petitioner, might have done a considerable bit of damage." The court found that the petitioner had not shown prejudice and his allegation was without merit.

### a. Failure to investigate and present all available mitigation witnesses

We agree with the state that the evidence presented at the post-conviction hearing in this case does not rise to the quantum of evidence required by *Wiggins*. Furthermore, we

conclude that the evidence does not preponderate against the post-conviction court's finding that the petitioner had failed to show prejudice. Regarding the petitioner's claim that counsel failed to call, investigate, and present all available mitigation witnesses, the witnesses presented at the post-conviction hearing who did not testify during mitigation were Mr. Wilson, Ms. Baptist, Mr. Netters, Dr. Woods, and Dr. Auble. The testimony of Mr. Wilson and Ms. Baptist would not have provided any additional information outside of what those witnesses who did testify during mitigation gave, and, as the post-conviction court noted, it would have revealed unfavorable facts about the petitioner such as his abuse of alcohol and drugs. Both witnesses testified at the post-conviction hearing regarding the petitioner's past including his family which counsel presented during mitigation through the testimony of the petitioner's mother, father, aunts, and brother. Therefore, the petitioner was not prejudiced by not having Mr. Wilson or Ms. Baptist testify during mitigation, as they would not have provided any additional information which would have tended to cause the jury to strike a different balance. Mr. Netters' testimony regarding the conditions in the Shelby County penal system and his relationship with the petitioner would not have, as we previously stated, lessened the petitioner's culpability, helped the petitioner, or showed that a sentence other than death was more appropriate. Dr. Auble's and Dr. Woods's testimony regarding the petitioner's brain impairments was merely speculative and did not support diminished capacity or any of the statutory mitigating circumstances. In addition, the strength of the aggravating circumstances that the state presented suggests that the jury would not have reached a different decision had these witnesses testified. Accordingly, we conclude that the petitioner has failed to show that he was prejudiced by trial counsel's not calling these witnesses, and the issue is without merit.

**b. Failure to properly prepare those individuals who did testify as mitigation witnesses**

As previously stated in section II(3)(d) of this opinion, the petitioner has failed to show how additional witness preparation would have affected the outcome of his case. The witnesses who testified during mitigation offered no evidence regarding how additional preparation would have altered or improved their testimony. Accordingly we conclude that the petitioner has failed to show prejudice and, therefore, is not entitled to relief on the issue.

**9. Failure to challenge the jury instructions**
**a. Failure to challenge the heinous, atrocious, or cruel jury instruction**

The petitioner contends that trial counsel was ineffective for failing to challenge the trial court's instruction to the jury regarding the heinous, atrocious, or cruel aggravating circumstance. The petitioner concedes that the trial court instructed the jury per Tennessee Code Annotated section 39-13-204 and that he challenged the heinous, atrocious, or cruel

77

aggravating circumstance on direct appeal. The petitioner asserts that his prior challenge "was that there was not sufficient evidence to support [the heinous, atrocious, or cruel aggravating circumstance]." The petitioner claims that because trial counsel were ineffective, the jury was unable to consider that the victim's "high intake of alcohol caused coagulopathy which, in turn, caused more bleeding and bruising" or that the petitioner's "frontal lobe impairments are associated with problems in stopping, braking, or modulating ongoing behavior." The state contends that the petitioner has raised this issue for the first time on appeal and has thus, waived the issue. We disagree. Because Dr. Woods's testimony raised this issue during the post-conviction hearing, we will address it.

Upon review of the petitioner's brief, we note that the petitioner's argument that the jury did not hear evidence regarding the victim's coagulopathy or the petitioner's brain impairments is essentially the same argument as in section II(A)(6) of this opinion. As we concluded above, even if counsel were deficient for failing to object to the heinous, atrocious, or cruel aggravating circumstance jury instruction, the petitioner has not shown prejudice because there were three other aggravating factors presented. Therefore, the threat that the petitioner could receive the death penalty remained. Accordingly, we conclude that this issue is without merit.

### b. Failure to object to other jury instructions

The petitioner also argues that counsel were ineffective for failing to object to several other jury instructions. The petitioner candidly admits that "Tennessee courts have ruled against the jury instruction issues that he raised in his Amended Petition" and stated that he is raising the jury instruction issues in his brief to "preserve them for possible review at a later stage of the proceedings." The petitioner continues to object to the following jury instructions:

1. That a unanimous verdict is necessary in order for the petitioner to receive a life sentence. This argument has been previously rejected by our supreme court. *See State v. Stevens* 78 S.W.3d 817, 850 (Tenn. 2002); *State v. Vann,* 976 S.W.2d 93, 118 (Tenn. 1998); *State v. Smith,* 893 S.W.2d 908, 926 (Tenn. 1994).
2. The jury enters into its investigation with a presumption that the defendant is not guilty of any crime and this presumption stands as a witness for him *until* it is rebutted and overturned by competent and credible proof. The petitioner claims that the court should have charged that the presumption stands *unless* it is rebutted. This instruction has been upheld. *See Ronald Donnell Moore v. State*, No. W2008-00034-CCA-R3-PC, 2009 WL 1424186, at * 7 (Tenn. Crim. App. at Jackson, May 20, 2009), *perm to appeal denied* (Tenn. Oct. 19, 2009).
3. "It is not necessary that the defendant's guilt be proven beyond all possible doubt,

*as absolute certainty of guilt is not demanded by the law* to convict any criminal charge." This jury instruction has been previously upheld. *See State v. Rimmer* 250 S.W.3d 12, 31 (Tenn. 2008); *State v. McPherson,* 882 S.W.2d 365, 374-5 (Tenn. Crim. App. 1994); *State v. Derek Denton*, No. 02C01-9409-CR-00186, 1996 WL 432338, at *8-9 (Tenn. Crim. App., at Jackson, Aug. 2, 1996).

4. That the jury may only consider a lower offense after it first considers the higher offense and finds the defendant not guilty of the higher offense. We have previously upheld this type of "sequential" jury instruction. *See State v. Rutherford,* 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993).

5. "It is not necessary that the aggravating circumstance(s) be proved beyond all possible doubt, as absolute certainty is not demanded by the law." This instruction was approved in *State v. Dellinger,* 79 S.W.3d 458, 501-2 (Tenn. 2002). *See also State v. Nichols,* 877 S.W.2d 722, 734 (Tenn. 1994).

6. That the murder was "knowingly committed, solicited, directed, or aided by the [petitioner], while the [petitioner] had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, *any burglary or theft*." The petitioner claims that the jury should have been charged in the disjunctive or charged to make a specific finding of upon which felony it relied. The argument that jurors must agree as to which theory supports that the murder is especially heinous, atrocious, or cruel has previously been rejected. *See State v. Keen,* 31 S.W.3d 196, 209 (Tenn. 2000).

All of the instructions to which the petitioner objects have been upheld and approved by Tennessee appellate courts; thus, the issues are without merit.

The petitioner further argues that "[c]ounsel were ineffective for failing to request an instruction concerning the consequences of failure to agree at [the] penalty [phase] and by failing to request an instruction that the jury be informed that guilt phase verdicts will not be affected." The petitioner asserts that such an instruction is necessary because without it "the jury may erroneously assume that a failure to agree as to penalty will also require a guilt retrial." This argument has been previously rejected by our supreme court. *See State v. Ivy,* 188 S.W.3d 132, 162 (Tenn. 2006); *State v. Stevens,* 78 S.W.3d 817, 850 (Tenn. 2002); *Vann,* 976 S.W.2d at 118; *Smith,* 893 S.W.2d at 926. Thus, we find no error.

**10. Failure to raise or adequately raise certain issues on appeal from the petitioner's convictions and resulting sentences**

Next, the petitioner claims that appellate counsel were ineffective for failing to raise on appeal or inadequately raising the claims regarding ineffective assistance of counsel and the constitutionality of the death penalty which we discussed in this opinion. Appellate

79

counsel's representation did not fall below a reasonable standard for not raising the ineffective assistance on appeal.

> [T]his court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant . . . amount of development and fact finding such an issue entails." Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." The defendant runs the risk of having the issue resolved "without an evidentiary hearing which, if held, might be the only way that harm could be shown-a prerequisite for relief in ineffective trial counsel claims." The better practice is to make an ineffective assistance of counsel claim in a post-conviction proceeding.

*State v. Mosley*, 200 S.W.3d 624, 628-629 (Tenn. Crim. App. 2005) (citations omitted). Furthermore, even if appellate counsel were deficient, this court has found the claims to be without merit, therefore, the petitioner has not shown prejudice. This issue is without merit and the petitioner is not entitled to relief.

### III. Constitutional Errors in the Imposition of the Death Penalty

The petitioner also raises various constitutional challenges to the death penalty in general and as applied in his case, as well as to the capital sentencing scheme and the laws of this state. Specifically, the petitioner contends that: (1) Tennessee's death penalty scheme is unconstitutional; (2) Tennessee's present method of execution by lethal injection is unconstitutional under both state and federal law; (3) the petitioner's death sentence unconstitutionally impinges upon his fundamental right to life; (4) the petitioner's death sentence must be set aside because the indictment charging him with the crime for which he received his death sentence did not contain the aggravating circumstance used to enhance the penalty to death; and (5) the petitioner's death sentence violates his rights under customary international law and treaties by which the United States is bound, thereby violating the Supremacy Clause of the United States Constitution. For the reasons stated below, we conclude that these issues are without merit.

#### A. Tennessee's death penalty scheme is unconstitutional

The petitioner specifically argues that the Tennessee death penalty scheme is unconstitutional because (1) it fails to meaningfully narrow the class of death eligible defendants; (2) the appellate review process is not meaningful because the court cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, the information relied upon by the court for comparative review is inadequate and

incomplete, and the court's methodology is flawed; and (3) it gives prosecutors unfettered discretion to seek the death penalty. The petitioner's argument that the statute fails to meaningfully narrow the class of eligible defendants has been considered many times. *See State v. Middlebrooks,* 840 S.W.2d 317 (Tenn. 1992); *State v. Howell,* 868 S.W.2d 238 (Tenn. 1993). Likewise, courts have rejected the petitioner's argument that appellate review process is inadequate. *See State v. Cazes,* 875 S.W.2d 253, 268-69 (Tenn. 1994); *Vann,* 976 S.W.2d at 118-19. Finally, the petitioner's claims that the death penalty statute vests unfettered discretion as to whether or not to seek the death penalty in the prosecutor have been repeatedly rejected by the courts of this state. *See State v. Hines,* 919 S.W.2d 573, 582 (Tenn. 1995); *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn. 1994); *Cazes,* 875 S.W.2d at 268; *State v. Smith,* 857 S.W.2d 1, 23 (Tenn. 1993).

**B. Tennessee's present method of execution by lethal injection is unconstitutional under Article I, sections 8 and 16 of the Tennessee Constitution and Amendments 8 and 14 of the United States Constitution**

The petitioner asserts that execution by the means of lethal injection violates his rights to be free from cruel and unusual punishment. The Tennessee Supreme Court has considered this claim and determined that Tennessee's lethal injection protocol is consistent with both contemporary standards of decency and the overwhelming majority of lethal injection protocols used by other states and the federal government. *Abdur'Rahman v. Bredesen,* 181 S.W.3d 292, 306-07 (Tenn. 2005). On April 16, 2008, the United States Supreme Court affirmed the use of the three-drug protocol which Kentucky used in its lethal injection procedure. *Baze v. Rees*, 553 U.S. 35 (2008). Tennessee uses the same protocol as Kentucky. *Id.* (citing *Workman v. Bredesen,* 486 F.3d 896, 902 (6th Cir. 2007)). The petitioner is not entitled to relief on this issue.

**C. The petitioner's death sentence unconstitutionally impinges upon his fundamental right to life**

The petitioner argues that his death sentence impinges upon his fundamental right to life and is not necessary to promote any compelling state interest. This complaint is contrary to settled precedent as reflected in *Cauthern v. State,* 145 S.W.3d 571, 629 (Tenn. Crim. App. 2004) (citing *Nichols,* 90 S.W.3d at 604); *State v. Mann,* 959 S.W.2d 503, 536 (Tenn. 1997) (appendix); *State v. Bush,* 942 S.W.2d 489, 523 (Tenn. 1997)). Thus, the petitioner is not entitled to relief on this issue.

**D. The petitioner's death sentence must be set aside because the indictment charging him with the crime for which he received his death sentence did not contain the aggravating circumstance used to enhance the penalty to death**

The petitioner contends that the failure to include aggravating circumstances in the indictment violates the Fifth and Eight Amendments to the United States Constitution as well as Article I, sections 8, 14, and 16 of the Tennessee Constitution. The Tennessee Supreme Court has rejected this argument, stating, "[n]either the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution." *See Dellinger,* 79 S.W.3d at 467; *State v. Holton,* 126 S.W.3d 845, 862-63 (Tenn. 2004).

**E. The petitioner's death sentence violates his rights under customary international law and treaties by which the United States is bound, thereby violating the Supremacy Clause of the United States Constitution**

The petitioner next argues that Tennessee's imposition of the death penalty violates treaties of the United States and, therefore, the federal constitution's Supremacy Clause. He contends that the Supremacy Clause was violated when the court disregarded his rights under treaties and customary international law to which the United States is bound. The courts have systematically rejected arguments that the death penalty is unconstitutional under international laws and treaties. *See State v. Odom,* 137 S.W.3d 572, 600 (Tenn. 2004); *see also Medellin v. Texas*, 129 S.Ct. 360 (2008) (holding that international treaty is not binding on domestic law unless Congress enacts statutes implementing it or unless the treaty is self-executing and that decisions of the International Court of Justice are not binding on domestic law). We discern no viable reason to resolve this issue in a different manner in this case. The petitioner is not entitled to relief on this issue.

## Conclusion

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that the petitioner has failed to demonstrate that he is entitled to post-conviction relief. The judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE